2006 ND 55

**Tammi SISK, Plaintiff and Appellee**

v.

**Stewart SISK, Defendant and Appellant.**

**No. 20050232.**

Supreme Court of North Dakota.

March 29, 2006.

Rehearing Denied April 19, 2006.

 

Irvin F. Nodland, Irvin B. Nodland, P.C., Bismarck, ND, for defendant and appellant.

Lynn M. Boughey, Boughey Law Firm, Minot, ND, for plaintiff and appellee.

MARING, Justice.

[¶ 1] Stewart Sisk appeals from an amended judgment modifying custody and visitation and awarding attorney's fees. We affirm.

I

[¶ 2] Stewart and Tammi Sisk were divorced in 2003. Stewart remained in North Dakota, and Tammi moved to Oklahoma. By stipulation, Stewart received physical custody of the parties' three minor children, and the judgment provided Tammi was to have "reasonable and liberal visitation as agreed upon [b]etween the parties and the minor children" and "reasonable access to the [children] by written, telephonic, and electronic means."

[¶ 3] Tammi had little physical or verbal contact with the children during the eighteen months following the divorce. The reasons for this lack of contact are in dispute, and each party blames the other. However, Tammi sent occasional cards and gifts during this time. She eventually sought visitation and began occasionally calling the children. Although both parties acknowledge Stewart would offer the phone to the children when Tammi called, the children often refused to speak to their mother. When this happened, Stewart did not require or encourage the children to talk to their mother. Other times Tammi called to find Stewart had forwarded the home telephone to his cellular telephone, thus making it difficult or impossible for her to speak to the children. Tammi also requested visitation over several weekends and holidays, but the children declined and Stewart did not require their participation.

[¶ 4] In July 2004, Tammi moved for structured visitation. Tammi and Stewart then agreed Tammi would have a ten-day visitation with the children in North Dakota in August 2004. Although Stewart says he made the children available to their mother, Stewart did not encourage or require them to cooperate when they resisted or refused to participate in the visitation. The record also shows Stewart involved third parties at a local church during the August visitation. Tammi viewed involvement of those people as willful interference with her visitation. Thereafter, Tammi continued with her motion for structured visitation.

[¶ 5] A hearing was held before the trial court on February 2, 2005. Following the hearing, the trial court issued its interim order. The trial court ordered a weekend visitation between Tammi and the children, awarded Tammi $8,904 in attorney's fees for having to bring the motion, awarded Tammi $793.91 for transportation costs for the failed August visit, and ordered counseling be arranged for the children and both parents. The trial court also stated it would issue a final memorandum and order at a later date. On February 16, 2005, Stewart objected to the award of

attorney's fees on the basis that Tammi had not requested attorney's fees in her initial motion. Tammi then moved for attorney's fees under N.D.C.C. § 14–09–24. On June 6, 2005, the trial court filed a supplemental memorandum and order relating to summer visitation. The trial court awarded Tammi a month of visitation, starting July 10 and ending August 7, with the first ten days in North Dakota and the remainder of the time in Oklahoma. On June 20, 2005, the trial court entered a memorandum and order denying Stewart's motion to reconsider, which stated Stewart was "willfully and persistently denying visitation rights" and awarded attorney's fees under N.D.C.C. § 14–09–24. The trial court modified the amount it had awarded in its interim order downward to $7,300, but kept the $793.91 award for travel expenses.

[¶ 6] Stewart appeals, claiming the evidence does not support the conclusion he deliberately and persistently interfered with Tammi's visitation, the trial court's award of attorney's fees was improper, and the trial court's chastisement of him on the record exhibited bias that Stewart claims deprived him of a fair hearing. Stewart does not challenge the removal of the provision from the original judgment that granted the minor children a role in establishing visitation.

## II

[¶ 7] The crux of Stewart's first and second arguments is that there is not sufficient evidence to support the trial court's determination he unlawfully interfered with Tammi's visitation. Stewart asks that we vacate the trial court's judgment with regard to visitation, set aside the assessment of attorney's fees, and remand the case to a different judge so that a plan for reconciliation through the use of professional counselors can be established.

Tammi argues structured visitation was necessary because Stewart deliberately and intentionally interfered with her right to visitation with her children. Further, she argues such "willful and persistent denial of visitation rights" entitles her to attorney's fees under N.D.C.C. § 14–09–24. *See Sweeney v. Sweeney*, 2005 ND 47, ¶ 12, 693 N.W.2d 29.

[¶ 8] A trial court's determinations regarding visitation are findings of fact that are not upset on appeal unless they are determined to be clearly erroneous. *Eberhardt v. Eberhardt*, 2003 ND 199, ¶ 19, 672 N.W.2d 659.

## A

[¶ 9] Stewart argues the evidence does not support the trial court's determination that he willfully and deliberately interfered with visitation.

### 1

[¶ 10] First we address Stewart's assertion that the divorce decree's language somehow meant he need not work towards facilitating visitation. The parties January 30, 2003, divorce decree stated: "[Tammi] is granted reasonable and liberal visitation as agreed upon [b]etween the parties and the minor children." Stewart argues this language allowed the children to essentially veto any proposed visitation they did not agree with.

[¶ 11] To include such language in the divorce decree was error. In *Barrett v. Barrett*, the Minnesota Court of Appeals dealt with a divorce decree containing similar language and stated that, while a child's choice when determining visitation, particularly when the child is of a certain age, should be given some consideration:

> [T]his consideration does not permit a court to delegate to the children its role of determining an appropriate visitation schedule or the role of the custodial

parent to make specific arrangements to comply with that schedule. Here, the trial court's order not only removes responsibility from those who should bear it but puts the children's welfare in jeopardy by demanding regular expression of their choices and their singular responsibility to determine what visits will occur. It is not in the children's best interest to become bargaining agents between their parents in working out arrangements for each visitation.

*Barrett v. Barrett,* 394 N.W.2d 274, 279 (Minn.App.1986).

"While there is nothing wrong with the children being heard regarding their wishes, our law proceeds on the assumption that they are nevertheless children and, thus, more interested in the desire of the moment than in considering the long range needs for the development of a healthy relationship with both parents where that is possible."

*In the Matter of the Marriage of Kimbrell,* 34 Kan.App.2d 413, 119 P.3d 684, 693 (2005) (quoting *Ellis v. Ellis,* 840 So.2d 806, 813 (Miss.App.2003)). The trial court, correctly, struck the language making the children a party to visitation deliberations in its February 4, 2005, interim order and its July 11, 2005, amended judgment.

[¶ 12] In its February 3, 2005, interim order, the trial court makes it clear that it is removing the erroneous language in the decree to prevent Stewart from continuing to use the language as an excuse. It is clear the trial court finds that Stewart's conduct in denying Tammi's visitation rights goes beyond that which can be justified by reliance on the erroneous provision in the decree. The record in this case supports the conclusion that Stewart's actions in this matter were not a result of his reliance on the erroneous language included in the divorce decree.

[¶ 13] In his brief, Stewart states: "[t]he January 30, 2003 Judgment stated explicitly that the children had to be in agreement with whatever visitations were arranged." Stewart's conduct shows that he was willing to make visitation agreements without consulting the children. In July 2004, as a result of Tammi's July 2, 2004, motion for structured visitation, Tammi and Stewart agreed to give Tammi visitation with the children for seven to ten days in August. The record also shows an earlier instance when Stewart tried to get Tammi to live in the family home again for a month, ostensibly for the purpose of visitation.

[¶ 14] Stewart made agreements for visitation, but then used the children's recalcitrance as a basis for violating them. Stewart's testimony throughout the February 2, 2005, hearing indicates he does not believe that helping to facilitate visitation is his responsibility in any way.

Q Alright. You realize that if the Judge grants our motion that—for structured visitation—it's going to be very specific. It's no longer going to be the children if they say yes or no. It's going to be the children will go on this date with their mother for this many days. Do you understand that's what we're asking?

A Right. I'm understanding what you're asking.

Q And if the judge enters an order such as that—which is a traditional structured visitation order—how do you intend to make sure your children comply with it?

A Well I would encourage them to comply with it, but getting them to do it would be another—it would be up to somebody else I guess, wouldn't it.

Q Well no, actually you're the custodial parent. It would be up to you sir.

A Well I don't really think so but ...

Q So you think it's okay for you to allow your children to violate a judge's order?

A Well let's see. [One daughter] will be fifteen years old. I have no way ... How could I possibly make a fifteen year old go any place she didn't want to go?

In making its oral order at the end of the February 2, 2005, hearing, the trial court states: "When a parent abdicates—gives up—their right to be a parent and [lets] a child run their lives, that is dysfunction and that's how a lot of problems get started." The trial court did not find credible Stewart's assertion that his failure to facilitate visitation between the children and Tammi was due to his reliance on the language of the divorce decree. Rather, it found the failure to facilitate visitation was due to Stewart's deliberate and willful actions to interfere with Tammi's visitation.

2

■ [¶ 15] The record contains further support for the trial court's determination that Stewart's actions willfully and deliberately interfered with Tammi's right to visitation. Although he did provide Tammi some opportunity to see the children, the August 2004 visitation did not proceed as Tammi and Stewart had agreed. Under the agreement, Tammi was to have visitation with the children a total of ten days. The children were to return home to their father in the evening of the first three days, and stay with Tammi twenty-four hours a day for the remaining seven days.

[¶ 16] Tammi flew from Oklahoma to Montana, then drove with her father to Minot for the sole purpose of the visitation. The proposed meeting place where Stewart and Tammi would exchange the children was a church Stewart and the children attended. After both parties and the children arrived, the children refused to go with Tammi and the pastor of the church told Tammi she had no right to the visitation because she did not have a court order. Tammi did not exercise visitation with the children that day. During the course of what the parties had agreed would be a ten-day visit, Tammi ended up receiving only about twenty-four total hours with the children. Stewart claimed at the hearing that this was not his responsibility.

THE COURT Just a minute. Did you make the agreement? I want to know that.

MR. BOUGHEY Yeah—

THE WITNESS Did I make the—what agreement now?

THE COURT The agreement—

Q Did you make the agreement for those seven to ten days?

A Correct.

THE COURT Well then I don't understand that. Mr. Sisk, I do not understand that.

THE WITNESS I don't understand either. But what?

THE COURT You made an agreement.

THE WITNESS Yes.

THE COURT And you didn't make your children do it?

THE WITNESS Yes, they went to Minot.

THE COURT No.

THE WITNESS No.

THE COURT On the ten day thing.

THE WITNESS Well it was—

THE COURT Wait a minute.

THE WITNESS Well I don't understand what you mean.

THE COURT You're using your child as a shield.

THE WITNESS No.

THE COURT You made the agreement.

THE WITNESS Correct.

THE COURT And it's your obligation to carry it out.

THE WITNESS Correct.

THE COURT Then why didn't you?

THE WITNESS Well, I brought the kids to the meeting and they wouldn't go.

THE COURT No. Then did you tell them to go.

THE WITNESS I did.

THE COURT Then you take—then that's where they go. You do not take them back.

THE WITNESS Well how did I ... I can't physically make them go. I told Tammi she could physically take them if she wanted to.

Stewart's profession of his concern for his children's welfare is tarnished by his statement at the church that Tammi could take the children by force if she wanted to. Further, Stewart's attempts to place fault for the lack of visitation on the children's preferences is contradicted by Tammi's account of what happened at the church.

Q Alright, and so once he arrived at the church parking lot with the five girls, what happened?

A The girls went inside the church. I had handed Stewart the card for the motel with the phone number where we'd be—would be staying so that he could get in contact with us. Then the pastor called us into the church and asked us to sit down in the sanctuary—or in the dining hall part of it, and so we went in and we sat down.

Q Okay, and again I don't want to go detail by detail, but were you allowed at that time to take your children and start your visitation?

A No.

. . . .

Q So how long were you in the church from the time you walked in to the time you finally left?

A We were in the church for several hours. That was 1:00 o'clock. I think we left by 3:00 or 3:30.

Q And during that 3:00 and 3:30 did at any time the children get in your car and leave with you?

A No they did not.

Q And did the pastor and all the people that were there discuss—I guess—the nice big discussion with all the kids about this visitation?

A The pastor had said that I could not take the children because I did not have a court order—or a Judge's order is maybe what he called it.

MR. ALM I'll object to that for hearsay, Your Honor.

THE COURT Your client can rebut that.

Q So there were phone calls to the lawyers, the lawyers tried to make it happen, but it didn't happen, right?

A No, it didn't happen.

Q So then at the end of it I guess did Stewart in your presence tell the children they had to go with you and assist in making that happen?

A No Stewart said he wasn't going to make the children go with me. He said that if I wanted to take the children I would have to physically place them in the vehicle and take them with me.

As a result of the failed August visitation, the parties continued to pursue resolution of the visitation issue through litigation. In its June 20, 2005, memorandum and order denying motion, the trial court states:

Stewart has always expressed reluctance to any visitation. The parties negotiated

a visitation for August, 2004. By his actions, Stewart caused great difficulties in that visitation which required further emergency negotiations to permit Tammi to have some visitation after making a long trip from Oklahoma. At the hearing Stewart took the position that the children did not want visitation, and they were causing the problem. He did not want to take any role that would require him to assert his parental duties about visitation.... Although the hearing was for structured visitation, Stewart presented no proposed visitation schedule.

We believe the evidence supports the trial court's finding that Stewart has deliberately and intentionally interfered with visitation through his delay tactics, failure to cooperate, and refusal to in any way facilitate visitation between his children and their mother.

### 3

■ [¶ 17] Stewart asserts the trial court did not consider evidence presented that indicated visitation with Tammi would be harmful to the children. We do not agree. Our Court recently reiterated:

> Visitation is a right of the child and is presumed to be in the child's best interest. The trial court's decision on visitation is a finding of fact and will not be reversed unless it is clearly erroneous. Under the statute, the court must grant such rights of visitation as will enable the child and noncustodial parent to maintain a parent-child relationship that is beneficial to the child, unless the court finds that visitation is likely to endanger the child's physical or emotional health.

*Paulson v. Paulson*, 2005 ND 72, ¶ 19, 694 N.W.2d 681 (citations omitted). When considering a trial court's findings of fact, "due regard shall be given to the opportu-

nity of the trial court to judge the credibility of the witnesses." N.D.R.Civ.P. 52(a).

[¶ 18] On July 11, 2005, the trial court issued its findings of fact, conclusions of law, and order for amended judgment. The trial court incorporated the February 3, 2005, interim order; February 4, 2005, memorandum; February 24, 2005, memorandum; June 6, 2005, supplemental order and memorandum; and, the June 20, 2005, memorandum and order. In its February 24, 2005, memorandum relating to visitation, the trial court states: "When the Court made its oral order at the close of the hearing, it did not state the reasons for ordering visitation. Mr. Sisk's reason was that the children did not want visitation. He did not demonstrate that the children would be harmed if there was visitation." The court then goes on to discuss the evidence presented that indicated Tammi can provide a stable and suitable environment for the children to visit. Next, the trial court discusses Dr. Johnson's testimony and states: "The Court believes that there are issues that need to be addressed by the children through counseling and directed that counseling be undertaken by all family members if possible."

[¶ 19] The trial court also stated in its February 24, 2005, memorandum relating to visitation that Stewart "did not demonstrate that the children would be harmed if there was visitation." The trial court heard testimony from Stewart showing he had no reason to believe a visitation to Oklahoma would, in any way, endanger the children.

Q —where [sic] the children—the minor children to go down to Oklahoma for-we're hoping—between four and ten weeks. Do you have any evidence to provide to the court today that that would be dangerous for the children, that they would be in harms way, they would be in a

situation where they could be either physically or mentally harmed in any way?

A Well I haven't done any investigation to the situation. I have no idea. No way of knowing.

Q So your answer is sir then that you have no evidence to provide to the court today that there is anything that would be considered harmful to the children by going to visit their mom in Oklahoma, correct?

A Correct.

The trial court also heard testimony from Tammi regarding her home, job, and boyfriend. Following that testimony, the trial court stated in its February 24, 2005, memorandum relating to visitation: "The evidence presented is that [Tammi] has a stable environment that is suitable for the children to visit." Stewart's concern about any possible negative effect Tammi's presence would have on the children is contradicted by his desire to reconcile with her.

Q As a matter of fact, you have in the last year offered more than just to have Tammi to come and stay, you've offered to reconcile, offered to be married again, right?

A Correct. I've never disagreed with her. I've given her everything she wanted and I said—

Q Except visitation.

A —she can come home any time she wants to.

Q Except you haven't facilitated visitation. All you've done is you've been the neutral person holding the phone, do you want to talk to your mother, right?

A I've tried to stay pretty low key in this.

Q Yeah. Don't you see that's part of the problem?

A I don't consider that part of the problem.

Stewart argues the trial court totally ignored "the recommendations of Dr. Johnson that before further visitations would take place a counselor or therapist should first work slowly with the children to get them to some level of acceptance." However, the court's February 3, 2005, interim order does order counseling for the children and parents. Further, the trial court considered Stewart's testimony that the children had visited Dr. Johnson to see if they could handle the hearing, not regarding visitation with their mother.

[¶ 20] The trial court's finding that visitation was not likely to endanger the children's physical or emotional health is not clearly erroneous.

B

[¶ 21] Stewart also argues it was improper to award Tammi attorney's fees and costs after the trial court found he had interfered with visitation.

[¶ 22] Our statute dealing with attorney's fees when a custodial parent interferes with the visitation rights of the other parent states:

> In any proceeding in which child visitation is properly in dispute between the parents of a child, the court *shall* award the noncustodial parent reasonable attorney's fees and costs if the court determines there has been willful and persistent denial of visitation rights by the custodial parent with respect to the child. The court may use any remedy that is available to enforce a child support order and which is appropriate to enforce visitation.

N.D.C.C. § 14–09–24 (emphasis added). In *Sweeney v. Sweeney*, our Court stated that a "trial court must award reasonable attorney fees and costs to the noncustodial parent if it determines there has been

willful and persistent denial of visitation rights by the custodial parent." 2005 ND 47, ¶ 12, 693 N.W.2d 29.

[¶ 23] Stewart's willful and persistent denial of Tammi's visitation rights is evidenced in his account of the August 2004 incident at the church.

Okay that day in the church, I was out of my car and all this was taking place in the church, okay? Tammi came out of the church and I met her on the sidewalk when she come out, and she asked me to physically make those kids go with her. She said, "You have to make those kids go with me", and I told her I says, "No, I will not do that", because by doing that I would destroy what—you know—trust these kids had in me now. I mean I'm their only dependable parent that's here. I mean if I betray them by forcing them to do something that they weren't ready to do, I felt that I would be alienating them against me and losing their trust, and I just didn't think that that would be a good situation. I mean you know if she could talk them into it fine. I presented—I mean I let her have the field you know, but I was not going to let them . . . I wanted to stay neutral—you know—in this. I didn't want to appear to be—you know on anybody's side. I mean even when I used to talk to Tammi when the kids didn't want me to—didn't want to talk to her you know. They used to look down on me. . . .

The record also reveals the following exchange during which Stewart indicates his motive for not facilitating visitation.

Q   If the children refuse to follow the Judge's order and you are in charge of those children—

A   Correct

Q   —what forms of discipline would you use to make sure they comply with the Judge's order?

A   I guess that would be up to the court to discipline them somehow. If they defied his order well that would be up to the court to devise the punishment, wouldn't it?

Q   Well I'm asking whether or not— since you say you want to foster visitation—whether—what steps you would take to assist the Judge in making sure the order was implemented?

A   Well I don't know how I could possibly betray my children—you know— and force them into something they didn't want to do. I mean what kind of respect would they have for me?

. . .

Q   Do you have any control over your children at all?

A   [Laughs] I have complete control over them. I mean not complete but I mean they—you know . . . I mean how do you make somebody study if they don't want to study?

Q   Somebody once told me the two rules of raising children is bribery and fear.

A   And fear, yeah. [Laughs]

By Stewart's own admission, his conduct is deliberate and intentional. He does not feel he needs to do anything to facilitate visitation. Stewart frustrated a resolution of this matter by agreeing to the August 2004 visitation, postponing Tammi's pursuit of her motion for structured visitation, and then did not follow through on the agreement. Stewart's actions constitute willful and persistent denial of visitation rights.

C

[¶ 24] Finally, we address Stewart's claim that he was denied his due process rights by the trial court's conduct. Stewart claims the trial court ridiculed him and called him inappropriate names that

intimidated both Stewart and his counsel. An issue of judicial disqualification for bias generally cannot be raised for the first time on appeal. *Kemp v. City of Grand Forks*, 523 N.W.2d 406, 408 (N.D.1994).

[¶ 25] Further, our review of the record and the specific incidents Stewart claims violated his due process rights, when taken in context with the nature of the proceeding and Stewart's recalcitrance in taking any responsibility in this matter, do not indicate behavior on the part of the trial court that rises to the level of a due process violation. The trial court was frustrated by Stewart's refusal to play any part in facilitating visitation between the children and Tammi and was attempting to encourage Stewart to realize that the best solution to the situation would be for the parties to come to an agreement; not to have one imposed upon them by the court.

[¶ 26] We do not believe the trial court's statements to Stewart can be interpreted as an attack on Stewart or an indication of bias against him. Rather, they are an indication that the trial court would not allow Stewart to continue to claim he could be a neutral party, a "nothing," in the efforts to have some visitation occur between the children and their mother.

### III

[¶ 27] We affirm the trial court's amended judgment modifying custody and visitation and awarding attorney's fees.

[¶ 28] CAROL RONNING KAPSNER and DALE V. SANDSTROM, JJ., concur.

CROTHERS, Justice, dissenting.

[¶ 29] I respectfully dissent. I would reverse because neither the district court nor the majority adequately account for the "and the minor children" provision of the original divorce decree. Additionally,

I believe the district court's actions deprived Stewart of a fair hearing.

[¶ 30] The necessary starting point is a better understanding of the facts and why the minor children were given a voice in visitation. Stewart and Tammi were married for approximately twenty-seven years and had six children together, two of which were minors at the time of this proceeding. In 2002, Tammi left Stewart and the children without so much as a "goodbye" and moved to Oklahoma. She immediately moved in with a man she had met on the Internet and his teenage son. Tammi made no attempt to contact the children by phone or in person for nine months and, in fact, declined an opportunity to travel to North Dakota to see her children during that time in order to attend her boyfriend's family reunion in California.

[¶ 31] At the district court proceedings, the minor children, ages eleven and fourteen, expressed great fear and apprehension about visiting their mother, stating she was "like a stranger," they "didn't know her" and admitting they "didn't want to see her." The youngest was angered by the fact that Tammi left them, testifying "if she loved me she would have stayed home." Both children denied Stewart spoke negatively of Tammi. In fact, neither knew the reasons for the divorce, other than the youngest's explanation that "[Tammi] was always on the computer and [Stewart and Tammi] fought." Both children reported they were fearful of visitation in Oklahoma because they did not know and were afraid of Tammi's boyfriend.

### I

[¶ 32] When the parties were divorced in 2003, Tammi's attorney drafted the divorce judgment to state, "[Tammi] is granted reasonable and liberal visitation as agreed upon [b]etween the parties *and the*

*minor children.*" (Emphasis added.) The majority discounts the relevance of this language, arguing Stewart illegitimately used it as an excuse to justify his actions. The majority relies on a Minnesota Court of Appeals case, *Barrett v. Barrett*, 394 N.W.2d 274 (Minn.App.1986), to bolster its position.

[¶ 33] At the outset, visitation in *Barrett* varied greatly from the decree here. 394 N.W.2d at 278–79. The *Barrett* judgment granted specific visitation to the mother—specifically, alternating weekends, holidays, and two weeks' summer visitation, and only allowed for "the exact days and times [ ] to be agreed upon between [appellant] and the children." *Id.* at 279. Furthermore, at issue in *Barrett* was whether such language should be stricken, not whether one parent could reasonably rely on such language as allowing for the children's "veto power." *Id.* Here, Stewart's contention lies not with whether such language can or should be stricken; rather, it is whether he deliberately and intentionally denied Tammi her visitation rights by relying on the terms of a valid judgment and whether he received a fair hearing. Therefore, *Barrett* provides no assistance when resolving the current matter.

[¶ 34] Stewart stated his reliance on the "and the minor children" provision in the judgment:

> THE COURT: Paragraph three says under terms of judgment, "That the plaintiff is granted reasonable and liberal visitation as agreed upon between the parties and the minor children." That's what you're referring to?
>
> STEWART: Correct.
>
> THE COURT: Alright and so you're [sic] assertion is that as a result of that language that the children can decide whether or not they have visitation. Is that your interpretation?

> STEWART: The children have to have their considerations taken into account.

There are, in fact, numerous references made by Stewart throughout the transcript expressing his reliance on the "and the minor children" provision. It is long-established in this state that a court's judgment, "however erroneous, is a complete justification, until reversed or set aside, of acts done in its enforcement and a protection to those who acted in good faith in reliance upon it." *Remmick v. Mills,* 165 N.W.2d 61, 66 (N.D.1968). We have even held an invalid order must be obeyed until stayed or reversed by order review. *State v. Zahn,* 1997 ND 65, ¶ 14, 562 N.W.2d 737. I therefore have trouble following how the district court and the majority can fault Stewart for relying on the judgment in this case.

[¶ 35] The majority also concludes Stewart's conduct was insufficiently consistent to show there was a genuine reliance on the "and the minor children" provision as an actual grant of "veto power," pointing to such instances as Stewart's willingness to arrange the August 2004 visitation and his statement that Tammi could "physically take [the children] if she wanted to." However, such instances show Stewart's willingness to facilitate visitation while preserving the children's input, as provided for in the judgment. The two minor children both testified that when visitations were arranged, Stewart always indicated the children could do "whatever [they] want to do." These instances are not evidence that he did not genuinely rely on the "and the minor children" language when he did not force the children to visit or speak with their mother.

[¶ 36] Stewart does admit apprehension about "forcing" his children to participate in visitation, even if the judgment were worded differently, both because the

children are of an age that forcing them would be difficult, and because he is "their only dependable parent." However, expressing such concerns is a far cry from permitting a finding of "willful and persistent interference." Furthermore, the majority's implication that Stewart would have violated the divorce judgment had it never contained the "and the minor children" provision is speculation.

[¶ 37] The majority fails to point to a single instance of Stewart's overt, active conduct actually rising to a level of deliberate interference with or "willful and persistent denial of" visitation, but proposes Stewart's inaction has risen to this level. However, Stewart's inaction cannot be interpreted this way under established precedent, especially in light of the "and the minor children" provision of the judgment. *See Sweeney v. Sweeney*, 2005 ND 47, ¶¶ 13, 17, 693 N.W.2d 29 (holding "willful and persistent denial" existed when mother "engaged in a continued course of conduct which minimized, limited, and obstructed" father's relationship with the child including failure to follow visitation orders, interrupting or interfering with visitations, and proactively denying reasonable access to the child); *Hendrickson v. Hendrickson*, 1999 ND 37, ¶¶ 3, 14, 590 N.W.2d 220 (holding attorney's fee award was warranted when custodial parent's "outrageous" conduct included removing children at the time of scheduled visitations and refusing to discuss or arrange visitation).

[¶ 38] In sum, the record does not support a finding that Stewart deliberately interfered with visitation. Nor does the record support a conclusion that the "and the minor children" provision of the divorce decree was given proper application. The district court's decision was therefore clearly erroneous and could, in fact should, be reversed on that basis alone. However, the court's conduct during the hearing presents an even greater concern and reason for reversal.

II

[¶ 39] This Court has indicated:

[A] trial court will ordinarily have broad discretion over the conduct of a trial or hearing. We also recognize that the court may impose reasonable restrictions on the length of the hearing or the number of witnesses allowed. However, when the court employs a procedure which fails to afford a party a meaningful and reasonable opportunity to present evidence on the relevant issues, the court has abused its discretion and violated the party's due process rights.

*Gullickson v. Kline*, 2004 ND 76, ¶ 16, 678 N.W.2d 138. Here, the district court's conduct resulted in a hearing that cannot be considered "fair" or consistent with the requirements of due process.

[¶ 40] The hearing began to deteriorate after approximately 45 minutes, when Stewart's counsel stated he would call a psychologist to testify about the potential harm visitation posed to the children. The court responded:

[Y]ou've got thirty minutes. After that I will hear the testimony, and unless you can prove there is endangerment, something highly detrimental, it's got to happen. I'm not interested in what the kids may want to do or not. That's not their option, and if anybody is giving them legal advice to that they're in error because we're fooling around instead of getting down to the nitty gritty. So I suggest I'll give you thirty minutes. From that point on you may not like what I'm going to do. So if you want input into this, it's time to get going.

After the psychologist's testimony, Stewart testified. Following brief questioning, during which Stewart insisted he was not

attempting to interfere with Tammi's visitation, the district court said, "You know, Mr. Sisk, you keep that up. You're getting boring." The court continued, becoming less detached and more confrontational and insulting:

STEWART: Yeah. I didn't realize I was supposed to force these kids to do something.

THE COURT: No. Don't make the agreement.

STEWART: Well I wasn't counsel. I mean I wasn't aware of that see.

THE COURT: Wait a minute. You knew those kids were going to rebel.

STEWART: Well I didn't for sure. I didn't know they were going to rebel.

THE COURT: You didn't?

STEWART: Well I knew they didn't want to go to Oklahoma, but I thought maybe they would foster some visitation with their mother while they were here.

THE COURT: You didn't think they would rebel?

STEWART: I really didn't know what was going to happen to tell you the truth. I mean I really didn't.

THE COURT: You've got to be dreaming.

STEWART: Well I ... Yeah.

THE COURT: You're pretty naive then.

As Stewart attempted to explain his reasoning in arranging the church as a drop-off location for the visitation, the court became more confrontational:

STEWART: I suggested ... I think I probably suggested ... Well [my lawyer] probably asked about a common meeting place like—

THE COURT: Well—

STEWART: —a restaurant or something.

THE COURT: I'm not talking about the meeting place. I'm talking about who asked the pastor and that other person to be there?

STEWART: Well we can't meet in the church without somebody there for their—

THE COURT: No, it didn't have to be in the church.

STEWART: Well I needed witnesses. I mean—

THE COURT: For what?

STEWART: Well it was the church property. I mean if something would have happened—

THE COURT: You had a big mouth.

STEWART: No.

THE COURT: You had a big mouth and asked somebody to be there so you could make a scene.

STEWART: I didn't make a scene.

THE COURT: Yes you did.

STEWART: I wasn't even there. I mean I went out into my—I was sitting in my car in the parking lot.

THE COURT: That's right and the exchange could have taken from one vehicle to the next. [sic] So who had the big mouth to tell them who to be there? [sic]

STEWART: Well I—The church—

THE COURT: No.

STEWART: No, I don't—I didn't ... I don't know if I asked anybody. I don't know how that went.

THE COURT: Oh you don't know how that went is clever right now.

STEWART: Well I mean—you know—I mean I thought that was—

THE COURT: You know—

STEWART: —you know to be—

THE COURT: You know, Mr. Sisk, let me tell you how you look.

STEWART: Okay.

THE COURT: You're a neutral person? I'm going to stand in the corner while all this takes place.

At this point in the proceeding, the district court judge actually rose from behind the bench and stood in the corner of the courtroom, facing the wall, mocking Stewart:

THE COURT: Right, and you think you have respect from your kids for being neutral? Forget it.

STEWART: Well I didn't know. I mean—

THE COURT: You didn't know? You go to see a counselor in October because it's beneficial to the hearing. It's not even beneficial to the kids. This doctor has to tell you your kids have abandonment issues and you aren't concerned about that?

STEWART: I'm concerned about it, yes.

THE COURT: But you're neutral.

STEWART: I mean between her and— you know—

THE COURT: No. You're neutral. You're a nothing.

STEWART: Okay.

THE COURT: If you're neutral you're a nothing because if they don't want it I don't have to do it. But yet I made an agreement.

STEWART: I—yes I made the agreement to bring them there, right. I thought it was up to Tammi and the kids to carry out the agreement. I didn't know that was anything for me—

THE COURT: I forgot you're neutral again.

The court began asking Stewart about why he did not force the children to participate in visitation:

THE COURT: [Laughs] That day you said there's no court order so you don't have to do it, couldn't you have simply said, "This is it kids. You're going to do it"?

STEWART: I didn't feel that was my place, Your Honor.

THE COURT: Well what is your place as a parent? I don't understand you.

STEWART: Yeah but isn't—

THE COURT: And I'm going to sit here for the next half hour and I won't know any more.

STEWART: I know. I just didn't feel it was in the best interests of my kids to force them into a situation they felt uncomfortable in.

THE COURT: Then why did you make the agreement?

STEWART: Well—

THE COURT: Because Tammi wanted it therefore Tammi can have it, but if the kids don't want to do it I look good. I did everything, and you did nothing.

STEWART: Well I had no idea it was going to deteriorate into what it did.

THE COURT: [Laughing] I'm sorry, Mr. Sisk. You're dreaming.

The court then opted to provide its opinion on the reason for the parties' divorce:

THE COURT: Well do you understand where your divorce came from?

STEWART: Actually, not really. [Laughs] I mean ask Tammi.

THE COURT: No, I can tell you today. You were a nothing.

The court continued its questioning for some time and then, possibly reflecting on the impropriety of its actions, stated:

I guess I'm telling you my frustrations and maybe I shouldn't do that either. I'm being—a [j]udge should be very neutral but I'm telling you how I'm seeing it. I'm being honest with you. I'm trying to-I mean as the—Dr. Johnson

said—you know—it would have been better if this had been worked out ahead of time. That doesn't always happen and so I'm trying to figure out what can I do and I don't have an answer. So I guess go ahead, [counsel]. I didn't mean to interrupt you but I got exasperated.

Questioning was shortly turned over to Stewart's counsel, who was unable to continue the proceedings due to the judge's conduct:

THE COURT: Yeah. Mr. Alm, do you want to—have any rebuttal or redirect—I guess—we would call it.

MR. ALM: I guess I'm a little fearful so no, Your Honor.

[LAUGHTER]

MR. ALM: I mean to be quite frank—I mean. No, Your Honor—

THE COURT: You know, Mr. Alm, let me tell you this. I get exasperated and I say these things. I get them out of my system so I'm better off then—I mean—and I should apologize because it's not tactful for me to do that, but I have to express what I'm feeling. But that does not prevent you from representing your client. I want you to understand that. So certainly feel free to pursue whatever avenue you want to go ahead with.

MR. ALM: I won't, Your Honor. I'm sorry.

THE COURT: No, I mean that's your prerogative. I have to ... Okay. You had nothing else then?

MR. ALM: I have nothing else.

Even after this point, the district court threatened Stewart with contempt of court and financial ruin, telling him at the conclusion of the hearing:

You're going to have to quit being neutral and you're going to have to decide do I stay a farmer or do I get my kids to do what they're supposed to do. You're going to have to decide to get off the fence or be in contempt of court, and I will own your farm and you will not. So it's time to tell the kids this is the way it's going to be, and if you have problems then I guess you'll pay me money.

[¶ 41] The majority is apparently untroubled by the conduct of the district court and the apparent or actual deprivation of a fair hearing that occurred. However, this Court has reversed for potential deprivation of a fair hearing in less extreme circumstances. In *Gullickson*, the "overall tenor and tone of the hearing," which included allowing the plaintiff to sit at counsel table rather than the witness stand during her testimony and abbreviating the hearing, were sufficient for this Court to conclude the defendant had been "denied a meaningful and reasonable opportunity to present his evidence and challenge [the plaintiff's] allegations, resulting in a denial of justice." 2004 ND 76, ¶ 22, 678 N.W.2d 138.

[¶ 42] This Court has established the standard for reversals based on violations of due process attributable to conduct during the proceedings: "[W]hen the court employs a procedure which fails to afford a party a meaningful and reasonable opportunity to present evidence on the relevant issues, the court has abused its discretion and violated the party's due process rights." *Gullickson*, 2004 ND 76, ¶ 16, 678 N.W.2d 138. Here, Stewart was verbally attacked by the court. These verbal attacks illustrate that no amount of evidence or testimony could have resulted in an outcome favorable to Stewart. Furthermore, the conduct was so shocking to Stewart's counsel that he felt continuing the trial would be detrimental or, at a minimum, fruitless.

[¶ 43] The conduct displayed here brings disrespect to the judiciary, destroys

public confidence, and deprived Stewart of the fair hearing to which he was entitled. I would therefore reverse and grant a new hearing, based on the manner in which the hearing was conducted, or, at a minimum, reverse based on the lack of evidence to sustain the court's findings.

[¶ 44] GERALD W. VANDE WALLE, C.J., concurs.