2006 ND 154

**Chad MARQUETTE, Plaintiff and Appellant**

v.

**Gretchen D. MARQUETTE, Defendant and Appellee.**

No. 20050296.

Supreme Court of North Dakota.

July 18, 2006.

Kevin Joseph Chapman, Chapman Law Office, Williston, N.D., for plaintiff and appellant.

Carrie Lynn Francis (argued) and Aaron Curtis Vibeto (appeared), Legal Services North Dakota, Minot, N.D., for defendant and appellee.

MARING, Justice.

[¶ 1] Chad A. Marquette appealed from a divorce judgment granting Gretchen D. Marquette custody of their three minor children, dividing their marital property, and ordering that he pay child support. He challenges the visitation provision of the divorce decree, the property distribution, and a part of the child support determination. We reverse and remand for the preparation of findings to explain the restricted visitation awarded to Chad Marquette, but we otherwise affirm the judgment.

I

[¶ 2] Chad Marquette and Gretchen Marquette were married in 1996 in Williston. They eventually had three children. After living about one year in Williston, the family moved to Dickinson, and in 1998 they moved again to Monticello, Minnesota, where they purchased a home. According to Gretchen Marquette, Chad Marquette was not stable and was easily agitated during the marriage. In November 2000, Chad Marquette was diagnosed by a psychiatrist as having mild depression and he was prescribed antidepressants to

treat the symptoms. While Chad Marquette was taking his medication, his condition slowly improved until January 2001, when Gretchen Marquette discovered he had not been taking all of his pills. After learning that he could not join the Navy if he was taking antidepressant medicine, Chad Marquette threw the pills away. Because Gretchen Marquette did not believe he was stable any longer, she returned to Williston with the children and obtained an emergency order allowing her to remain there with the children.

[¶ 3] After Chad Marquette began seeing a psychiatrist who placed him back on medication, Gretchen Marquette and the children returned to the marital home in Minnesota in August 2001. However, Gretchen Marquette began noticing changes in Chad Marquette's behavior during the summer of 2002. He was spending more time alone, was unable to sleep, was crying often, and was becoming delusional. His increasingly unusual behavior culminated in an incident in August 2002 where Chad Marquette, while the children were upstairs with Gretchen Marquette, intentionally shot himself in the foot with a shotgun while he was in the garage. Following the shotgun incident, Chad Marquette was hospitalized for his mental illness mostly on a semi-inpatient basis until November 2002. Gretchen Marquette, who had gone to Williston with the children, returned to the marital home upon his discharge.

[¶ 4] Although Chad Marquette continued his treatment and counseling, he began to go through violent mood swings, and Gretchen Marquette again returned to Williston with the children. Upon returning to Minnesota in late January 2003, Gretchen Marquette learned that Chad Marquette was on his way to Rome, Italy, "[b]y orders of the Pope." However, on the way to Rome, he was arrested upon arrival at St. John's, Newfoundland, and placed on a seven-day psychiatric hold. Chad Marquette remained in Newfoundland for three weeks, was diagnosed with bipolar disorder, and began receiving treatment there. Gretchen Marquette returned to Williston with the children, and when Chad Marquette came there to visit in April 2003, she noticed a significant improvement in his condition and she believed he was recovering. Chad Marquette commenced this divorce action in December 2003.

[¶ 5] During the February 2005 divorce trial, Gretchen Marquette sought primary custody of the children with supervised visitation for Chad Marquette. Chad Marquette testified that he was seeing a psychiatrist once a month, was taking antipsychotic medication and lithium to stabilize his anxiety, and had been taking his medications consistently. His mother testified that he had been stable for about five months. Chad Marquette also presented a January 2005 letter from a psychiatrist stating:

> Chad has been quite consistent with his follows [sic] ups since his return from North Dakota. He is seen on approximately a month to six week basis. He has been compliant with his medications, which are reflected by adequate Lithium levels. He has endorsed stability of his mood, and has not had any tendencies towards profound depressive symptoms or mania. He seems to be bettering himself through increased physical activity and monitoring his diet.

> Historically Chad has had rather significant symptoms, much of this occurred prior to his formal diagnosis of Bipolar Disorder. He has been quite compliant with his cares and has maintained stability recently. Currently, he is not a threat to himself, nor does he pose a significant risk to anyone else.

Gretchen Marquette admitted that she had not seen or heard Chad Marquette yell at or physically hurt the children, and that the children feel love and affection for their father.

[¶ 6] Following the trial, the district court granted custody of the children to Gretchen Marquette and awarded Chad Marquette "liberal visitation" with the "visitation occurring under the supervision of [Gretchen Marquette] or under the supervision of another party of [Gretchen Marquette's] choosing. The Court specifically reserves the right to review the need for supervised visitation and make such visitation modifications as the Court may deem appropriate in the future." The court divided the marital property and debt, awarding each party approximately $15,000 in net marital property. The court also ordered that Chad Marquette's total child support obligation would be $771 per month, which was the amount of Social Security Children's Benefits the children were receiving because of his mental disability.

## II

[¶ 7] Chad Marquette argues the district court erred in awarding him supervised, rather than unsupervised, visitation with the children.

[¶ 8] Visitation is governed by N.D.C.C. § 14-05-22(2), which provides:

After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship that will be beneficial to the child, unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health.

A district court's determinations regarding visitation are findings of fact that are not upset on appeal unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *Sisk v. Sisk*, 2006 ND 55, ¶ 8, 711 N.W.2d 203. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, upon review of the entire record, we are left with a definite and firm conviction a mistake has been made. *Bertsch v. Bertsch*, 2006 ND 31, ¶ 5, 710 N.W.2d 113.

[¶ 9] The district court granted "liberal visitation" for Chad Marquette, "with such visitation occurring under the supervision of [Gretchen Marquette] or under the supervision of another party of [Gretchen Marquette's] choosing," and reserved the right to review the need for supervised visitation in the future. The court's visitation decision not only restricts visitation to a supervised setting, but also delegates to Gretchen Marquette the authority to decide the manner and timing of visitation. Although the primary purpose of visitation is to promote the best interests of children, our statutes and case law recognize that visitation with a noncustodial parent may be curtailed or eliminated entirely if it is likely to endanger the child's physical or emotional health. *See, e.g., Simburger v. Simburger*, 2005 ND 139, ¶ 15, 701 N.W.2d 880; *Litoff v. Pinter*, 2003 ND 172, ¶ 12, 670 N.W.2d 860; *Negaard v. Negaard*, 2002 ND 70, ¶ 13, 642 N.W.2d 916. However, a restriction on visitation must be based on a preponderance of the evidence and be accompanied by a detailed demonstration of the physical or emotional harm likely to result from visitation. *See, e.g., Simburger*, at ¶ 15; *Wigginton v. Wigginton*, 2005 ND 31, ¶ 9, 692 N.W.2d 108; *Johnson v. Schlotman*, 502 N.W.2d 831, 835 (N.D.1993).

[¶ 10] Furthermore, a district court generally cannot delegate to anyone the power to decide questions of child cus-

tody or related issues. *See Paulson v. Paulson*, 2005 ND 72, ¶ 21, 694 N.W.2d 681. In *Wigginton*, 2005 ND 31, ¶ 1, 4, 7, 692 N.W.2d 108, however, we upheld a visitation provision allowing visitation for the father, who was battling a methamphetamine addiction, at the "sole discretion" of the mother. In upholding this "highly unusual" restriction on visitation, we reasoned:

> Giving the custodial parent such complete discretionary authority over the manner and timing of visitation should be used only when there is a demonstrated need to protect the children from the potential for physical or emotional harm *and* where, as here, the custodial parent has demonstrated that he or she is "deeply concerned that the children, for the children's benefit, maintain a relationship with" the noncustodial parent. The findings of the trial court specifically indicate Sandra Wigginton's willingness to foster the parent-child relationship between Joel Wigginton and his children. The court made a point of stating the visitation award can be modified at any time if Joel Wigginton feels he is being treated unfairly by Sandra Wigginton. He can also move to modify visitation once he has taken actions to convince the court he is no longer using drugs.

*Id.* at ¶ 12. As *Wigginton* indicates, we do not encourage the use of visitation provisions which give the custodial parent total control over the time and manner of the noncustodial parent's visitation. The use of these provisions should be reserved for the most exceptional of circumstances, and only if the custodial parent sufficiently demonstrates a willingness to foster the parent-child relationship between the noncustodial parent and the children.

[¶ 11] The district court made no findings of fact relating to the visitation issue. Before the court may properly impose these visitation restrictions, findings of fact are required detailing the physical or emotional harm to the children likely to result from unsupervised visitation, and explaining why supervised visitation under the sole control of Gretchen Marquette is necessary. The findings must also address whether Gretchen Marquette is willing to foster the parent-child relationship between Chad Marquette and the children. When a district court provides no indication of the evidentiary and theoretical basis for its decision, the reviewing court is left to speculate whether appropriate factors were considered and the law was properly applied. *Clark v. Clark*, 2005 ND 176, ¶ 9, 704 N.W.2d 847; *Berg v. Berg*, 2000 ND 36, ¶ 10, 606 N.W.2d 895. Under these circumstances, we are unable to perform our appellate function. *Clark*, at ¶ 9. We reverse the district court's visitation decision and remand for the preparation of findings to explain the restrictions imposed. It is within the district court's discretion whether to prepare the findings based on the existing record or to allow the presentation of additional evidence.

### III

[¶ 12] Chad Marquette argues the district court erred in dividing the marital property because it overvalued the marital home, failed to recognize debts the couple owed to his mother, and awarded Gretchen Marquette his retirement account.

[¶ 13] A district court's determinations on valuation and division of property are findings of fact which are reversed on appeal only if they are clearly erroneous. *Sack v. Sack*, 2006 ND 57, ¶ 15, 711 N.W.2d 157. A court's valuation of property is presumed correct and we view the evidence presented in the light most favorable to the court's findings of fact. *Korynta v. Korynta*, 2006 ND 17,

¶ 13, 708 N.W.2d 895. We have said the district court is in a better position to judge credibility, observe demeanor, and determine the facts regarding property value, and marital property valuations within the range of the evidence are not clearly erroneous. *Dvorak v. Dvorak,* 2005 ND 66, ¶ 20, 693 N.W.2d 646.

[¶ 14] The district court valued the marital home at $175,000. Although no professional appraisals were entered into evidence, both parties testified the home was initially listed for sale at $175,000, but the sale price was later reduced to $170,000. Chad Marquette's mother, a realtor who mainly works for farmers selling their land to developers, testified she thought the home could be sold for between $160,000 and $170,000. His mother also testified, however, that the house was on the market for only three months at $170,000, before she decided to rent it to others. Chad Marquette testified he plans to move back into the home, and it is unclear whether the home will be placed back on the market. Considering these uncertainties, we believe the district court's valuation is within the range of the evidence, and we conclude it is not clearly erroneous.

[¶ 15] Chad Marquette argues the court erred in failing to exclude $9,661 from the marital estate for payments made by his mother for the parties' medical insurance, home mortgage, and home equity line of credit. The parties disputed whether these payments were intended as loans or gifts. The mother's ambiguous testimony did not establish that she considered the payments loans rather than gifts. On this record, we cannot say the district court's failure to treat the payments as loans is clearly erroneous.

[¶ 16] Chad Marquette argues the district court erred in awarding Gret-

chen Marquette his retirement account as part of the property distribution. However, pensions and retirement benefits are marital assets subject to equitable distribution by the court. *See, e.g., Ebach v. Ebach,* 2005 ND 123, ¶ 16, 700 N.W.2d 684. Chad Marquette has failed to establish that the court's award of his retirement account to Gretchen Marquette is clearly erroneous.

[¶ 17] We conclude the court's distribution of marital property is not clearly erroneous.

## IV

[¶ 18] Chad Marquette argues this case should be remanded for clarification and to take additional evidence regarding "the exact amount of Social Security Children's Benefits that were received by Gretchen, including all retroactive lump sum back pay she received, so that a refund may be paid to Chad for past child support paid pursuant to the Interim Child Support Oder [Order]."

[¶ 19] The district court ordered:

Plaintiff is currently receiving Social Security Disability payments, thus making the minor children eligible to receive dependant benefits of $257.00 per month per child ($771.00 total). That amount will constitute the total child support obligation.

It is also anticipated that funds for child expenses for months prior to the award by Social Security will be awarded to the Plaintiff on behalf of the children. Those funds shall be considered back child support for the purpose of this Order and shall be distributed to the Defendant (custodian) as reimbursement (less credit for any child support the Plaintiff has previously paid from other sources.)

[¶ 20] The court simply ordered that any anticipated retroactive dependency benefits awarded to Chad Marquette shall be distributed to Gretchen Marquette, and Chad Marquette will be given credit for the child support payments he made under the interim child support order. If the parties cannot agree on the proper amount of credit, a motion can be made in the district court to resolve the issue. No clarification or remand is necessary.

## V

[¶ 21] We reverse the visitation provisions of the divorce judgment and remand for the preparation of findings of fact to explain the restricted visitation awarded to Chad Marquette. We affirm the remainder of the judgment.

[¶ 22] VANDE WALLE, C.J., and KAPSNER, J., concur.

I concur in the result. DALE V. SANDSTROM.

CROTHERS, Justice, concurring in part and dissenting in part.

[¶ 23] I respectfully dissent from Part II of the majority's opinion regarding visitation, but concur with Parts I, III, and IV providing facts of the case, affirming division of marital property, and declining to clarify or remand the child support issue.

[¶ 24] The majority reverses the district court judgment and remands for preparation of findings supporting supervised rather than unsupervised visitation for Chad Marquette. I believe the majority's approach needlessly prolongs this matter because Part I of the Court's opinion contains more than sufficient facts to allow this Court to decide the supervised visitation issue. Also significant, but ignored by the majority, is that Chad does not want the case remanded for findings.

[¶ 25] During oral argument Chad's counsel was asked whether he was requesting remand for additional findings. He unequivocally responded "no" because his position was based on the law rather than on the inadequacy of the district court's findings. Chad's position is evidenced by the following colloquy:

Justice Maring: So what are you asking us to do? Are you asking us to remand this to the district court for more specific findings, or are you asking, are you saying to us there, even if let's say if the trial court said—Well I made my decision based on, you know, the episode of him shooting himself in the foot, the manic episodes that he has had, and you know and so on, his noncompliance with meds in the past and I don't know if he is going to be compliant, you know, in the future. Would you be back up here again—I mean, if we sent it back and said make findings and the court made such findings to support its decision— Would you be back up here saying those are not sufficient?

Mr. Chapman: Your honor, my position is that there could be no findings under this record that would be sufficient to withstand prior case law by this Court and the statute that we are dealing with, 14–05–22(2). I am asking for a reversal and to institute the visitation suggestions as outlined in my brief and as testified to by—

Justice Sandstrom: It is your position— that it is not merely the court failed to make sufficient findings, but if it had made findings that on their face appeared to be sufficient they would be clearly erroneous, is that what your— because of—

Mr. Chapman: Absolutely, because there is no, there's no evidence, there's no finding that the court could possibly

make creating any causal link whatsoever—

This exchange conclusively establishes the issue here is not whether the district court's findings were adequate. Rather, the question is whether North Dakota law and this Court's precedent allow Gretchen Marquette to supervise and wholly control Chad's visitation.

[¶ 26] I would address the issue framed at oral argument. That is the real question now, and likely will be the question presented to us again after completion of the exercise in futility interposed by remand. I would also answer the real question in this case, and not remand for additional findings because, as explained below, facts supporting the district court's order are evident from both the record and the majority's own opinion.

[¶ 27] I agree with the majority that district courts generally need to provide adequate findings of fact to allow this Court to perform our appellate function. Majority opinion at ¶ 11; see In re Spicer, 2006 ND 79, ¶ 8, 712 N.W.2d 640. "However, we will not reverse a district court's decision when 'valid reasons are fairly discernable, either by deduction or by inference.'" Id. In this case, like in Spicer, the district court made virtually no findings. See id. at ¶ 9. And here, like in Spicer, we have all the information necessary to understand the underlying decision. I also note that the same dearth of findings that led the majority to remand the visitation issue provided adequate findings for us to affirm the district court's property distribution. Majority opinion at ¶¶ 12–17.

[¶ 28] Regarding visitation, the fact section of the majority opinion shows the parties were married from 1996 to 2005, during which time "Chad Marquette was not stable and was easily agitated." Majority opinion at ¶ 2. Chad was diagnosed with mild depression in November of 2000 and was prescribed antidepressants. Id. Chad quit taking his medication in January of 2001, and his mental condition was so unstable that Gretchen left the marital home with the children. Id. This protective move from Minnesota to Williston was supported by a North Dakota district court's emergency order allowing her to remain in Williston with the children. Id.

[¶ 29] Gretchen and the children returned to Minnesota in August 2001, but Chad's condition declined less than a year later when he was spending more time alone, was unable to sleep, was crying often, and was delusional. Id. at ¶ 3. In August 2002, Chad went into their garage and shot himself in the foot. Id. At the time of Chad's self-inflicted gunshot wound, Gretchen and the children were in their house which was attached to the garage. Id. Gretchen and the children again left for Williston, and Chad was hospitalized until November 2002.

[¶ 30] Gretchen and the children returned to Minnesota upon Chad's discharge from the hospital but again had to return to Williston when Chad experienced violent mood swings. Id. at ¶ 4. Gretchen went back to Minnesota in January 2003, only to learn Chad left for Rome on "orders of the Pope." Id. Chad was detained en route and hospitalized for three weeks. Id. Gretchen and the children returned to Williston. Id. Chad filed for divorce in December 2003. Id. During trial in February 2005, Chad's mother testified that Chad had been stable for about five months, meaning Chad had not been stable much of 2004. Id. at ¶ 5.

[¶ 31] Additional facts not included in the majority's statement of facts but cited in a brief filed with this Court show Chad has been consistently delusional during the marriage. He has told his children that they are decedents of European royalty

and has expressed the view that he has billions of dollars waiting for him in a London bank. Chad has engaged in violence with Gretchen and with his brother and father, the latter of which led to criminal charges against Chad. Chad shot himself in the foot as part of a perceived deal with the devil, and he has called Gretchen derogatory and demeaning names in public. He has also lost control and caused a public scene while with Gretchen and the children.

[¶ 32] The record contains additional details but these facts more than adequately demonstrate remand is not necessary to adjudicate this case. The district court ordered supervised visitation because the unfortunate facts surrounding Chad's mental illness establish unsupervised "visitation is likely to endanger the child's physical or emotional health." N.D.C.C. § 14–05–22(2). The district court's order is well supported by facts in the record, and remand will only delay— but not change—that conclusion. We should therefore proceed to answer the real question, namely whether the district court improperly gave Gretchen excessive authority to supervise Chad's visitation. Because the majority declines to do so, I respectfully dissent from that part of the opinion.

[¶ 33] DANIEL J. CROTHERS