******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LORI T.*
(AC 40384)

Prescott, Bright and Devlin, Js.

*Syllabus*

Pursuant to statute (§ 53a-98 (a) (3)), a person is guilty of custodial interference in the second degree when, knowing that she has no right to do so, she "holds, keeps or otherwise refuses to return a child . . . to such child's lawful custodian after a request by such custodian for the return of such child."

Convicted, after a jury trial, of three counts of the crime of custodial interference in the second degree, the defendant appealed to this court. The defendant's children were at her home in Glastonbury for purposes of visitation over a holiday weekend. The defendant's former husband, F, who is the children's father, had sole physical and legal custody of the children, but they wanted to live with the defendant and not with F. When F arrived to pick up the children in accordance with the visitation schedule, the defendant told F that she was not sending the children out to him because they did not want to come out and that she was going to do what the children wanted to do. F contacted N, a Norwalk police officer and the children's school resource officer, and told him about the children's refusal to return to his home in Norwalk. A few days later, N contacted the defendant by telephone and asked her why the children were not returned to F, and she told N that they did not want to come out to F and that she would not make them go with him. N then warned the defendant that she could be in trouble if she did not return the children to school. When the children were still not in school approximately one week later, N followed up with the defendant, who said that she would not return the children to school. Thereafter, N sought an arrest warrant for the defendant. On appeal, the defendant claimed that § 53a-98 (a) (3) was unconstitutionally vague as applied to her and that there was insufficient evidence to support her conviction. *Held*:

1. The defendant could not prevail on her unpreserved claim that § 53a-98 (a) (3) was unconstitutionally vague as applied to her, the defendant having failed to demonstrate the existence of a constitutional violation, and, therefore, her claim failed under the third prong of the test set forth in *State* v. *Golding* (213 Conn. 233):

   a. The defendant's claim that § 53a-98 (a) (3) was unconstitutionally vague as applied to her because the phrase "refuses to return" was not defined in the statute and its meaning was not otherwise sufficiently clear or definite to provide notice that her inaction of not forcing the children to go with F could expose her to criminal liability was unavailing; the language of the statute provided clear notice to the defendant that the core meaning of the phrase "refuses to return," which could be ascertained from common dictionary definitions, encompassed the behavior of a person who either affirmatively declines to return a child to his lawful custodian or declines to take any affirmative steps to do so upon the lawful custodian's request, and a person of ordinary intelligence in the defendant's circumstances would have understood that her abdication of any parental responsibility to return the children to F violated the core meaning of the statute.

   b. The defendant failed to demonstrate that she fell victim to arbitrary and discriminatory enforcement of § 53a-98 (a) (3); although the defendant claimed that the statute is subject to arbitrary enforcement due to its vagueness and that it, therefore, impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges and juries on an ad hoc basis, it was unnecessary to address the particular enforcement of the statute in this case, this court having concluded that § 53a-98 (a) (3) provided sufficient guidance as to what conduct is prohibited and that it has a clear core meaning within which the defendant's conduct fell.

2. The evidence was sufficient to sustain the defendant's conviction of three counts of custodial interference in the second degree; the jury reasonably

could have inferred from the evidence presented at trial that the defendant had the ability to take some action to return the children to F but that she refused to do so, F and N having testified that the defendant stated that she would not make the children go with F and that she was going to do what the children wanted, and the defendant having testified that she was going to support the children's decision not to go with F and that she was not going to make the decision for them, even though, as their mother, she had a certain amount of power do so.

Argued September 13, 2019—officially released June 2, 2020

*Procedural History*

Substitute information charging the defendant with three counts of the crime of custodial interference in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Megan L. Wade*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Emily G. Sexton*, assigned counsel, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Justina Moore*, assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Lori T., appeals from the judgment of conviction, rendered following a jury trial, of three counts of custodial interference in the second degree in violation of General Statutes § 53a-98 (a) (3). On appeal, the defendant claims that § 53a-98 (a) (3) is unconstitutionally vague in its application to her and that there was insufficient evidence to support her conviction. We disagree with both claims, and, thus, we affirm the judgment of the trial court.

The following facts, on which the jury reasonably could have based its verdict, and procedural history are relevant to the issues on appeal. The defendant's four children, R, L, T, S,[1] were at her Glastonbury home for purposes of visitation over the Memorial Day weekend in 2015. The defendant's ex-husband, the children's father (CF), had sole physical and legal custody of the children, and the defendant had rights of visitation. The children, however, wanted to live with the defendant and not with CF.

In fact, R had been staying with the defendant for several months; after a physical incident involving CF in January, 2015, R, with the involvement of the Norwalk Police Department and the Department of Children and Families, went to stay with the defendant. Over the Memorial Day weekend, the children all decided that they were not going to go home with CF on May 25, 2015.

During the course of the weekend, CF received a couple of e-mails from one of the children telling him that she did not want to return to his home and that she wanted to stay at the defendant's home. CF "went to pick . . . up [the children] on Memorial Day . . . according to [the] visitation schedule, which was 7:30 [p.m.], and [the defendant] came out of her house and told [him] that she wasn't sending the children out. The children didn't want to come out, and she was going to do what the children wanted to do." CF did not make any attempt to telephone the children regarding their decision to remain at the defendant's home, and he did not attempt to go inside the defendant's home to speak with the children in an effort to persuade them to return to his home. Instead, he went directly to the Glastonbury Police Department.

Officer Brian Barao of the Glastonbury Police Department went to the defendant's Glastonbury home to conduct a welfare check of the children at CF's request. He spoke with each child and determined that they all were okay. He did not arrest the defendant, but, rather, he encouraged her to seek legal counsel and to pursue these matters with the family court, which, the defendant told him, she was in the process of doing.

CF then returned to Norwalk and contacted Norwalk Police Officer Jermaine Nash, the school resource officer in Norwalk, whom he told about the children's

refusal to return to his home. Nash and CF knew each other through sporting programs at the schools, and Nash had been a visitor to CF's home several times. A few days after speaking with CF, Nash contacted the defendant by telephone and asked her why the children were not returned to CF. The defendant told Nash that "the kids didn't want to come out to [CF]." Nash made a comment about the defendant being "the adult," and he asked her why she just did not send them out to CF. According to Nash, the defendant told him that "[s]he won't make the children come out to him."

Wanting to ensure that the children returned to school, Nash told the defendant that she could be in trouble if she did not get the children back into school. The defendant agreed that she would return the children to school, and Nash agreed that he would not seek a warrant for her arrest. When the children still were not in school approximately one week later, Nash followed up with the defendant, who said she would not return the children to school. Nash then sought an arrest warrant on one charge of custodial interference in the second degree, and he contacted the Department of Children and Families.

On June 2, 2015, Nash contacted the Glastonbury Police Department for assistance in executing the arrest warrant; Officer David Hoover of the Glastonbury Police Department was at the defendant's Glastonbury home when Nash arrived. The defendant's aunt also was present at the home. At some point, CF also arrived at the scene. L testified that Nash threatened the children "by telling [them that] if [they] didn't go back to [CF], he would . . . pick [them] up and forcibly take [them] outside." T described Nash as "yelling" and "kind of harsh." Both Hoover and Nash tried to persuade the children to go with CF, but the children continued to refuse. Hoover telephoned the Department of Children and Families, and he arranged a meeting at its Manchester office, where he brought the children. The children continued to refuse to go with CF, and the defendant's aunt then was granted temporary custody of the children, who later were placed with their maternal grandmother, with whom they resided for several months after this incident.

The defendant later was charged with four counts of custodial interference in the second degree, one count for each child. Immediately before jury selection, the state dropped the charges as to R, the child who had been staying with the defendant for several months, and proceeded to trial on the three remaining counts. In a long form information dated January 9, 2017, the state charged the defendant in count one as follows: "The [s]tate of Connecticut accuses [the defendant] of [c]ustodial [i]nterference in the [s]econd [d]egree and charges that at the city of Glastonbury on or about May 25, 2015 at approximately 7:30 [p.m.] . . . the . . .

[defendant] did hold and keep for a protracted period and otherwise refused to return a child, to wit: [L], who was less than sixteen years old, to such child's lawful custodian, to wit: [CF] of Norwalk, after a request by such custodian for the return of such child, knowing that she had no legal right to do so, in violation of . . . § 53a-98 (a) (3)." The remaining two counts contained similar accusations for T and S. At trial, the state's theory of the case focused on the defendant's alleged refusal to return the children to CF. Following a trial to a jury, the defendant was convicted of all three counts.[2] This appeal followed. Additional facts will be set forth where necessary.

I

On appeal, the defendant claims that § 53a-98 (a) (3) is unconstitutionally vague in its application to her.[3] Specifically, she argues that the statute fails to define what it means when someone "otherwise refuses to return a child" to his or her lawful custodian, and, taking this lack of definition into consideration, it was impossible, under the facts of this case, for the defendant to know that her failure to force the children to go with their father could amount to a refusal to return under the statute. She argues that she did not refuse to return the children, as that phrase reasonably is understood but, rather, that the children voluntarily elected not to return to their father. She contends that the statute is void for vagueness as applied to her because it did not give her any notice that inaction on her part exposed her to criminal liability. Additionally, she argues that the vagueness of the statute impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges and juries on an ad hoc and subjective basis, and, therefore, the statute is subject to arbitrary enforcement, which clearly is demonstrated by the facts of this case. We are not persuaded.

"The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inher-

ent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . Moreover, an ambiguous statute will be saved from unconstitutional vagueness if the core meaning of the terms at issue may be elucidated from other sources, including other statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information . . . .

"Finally, even though a statutory term that is susceptible to a number of differing interpretations may be impermissibly vague as applied to some situations, the term is not necessarily vague as applied in all cases; rather, whether the statute suffers from unconstitutional vagueness is a case-specific question, the resolution of which depends on the particular facts involved. . . . Similarly, a term is not void for vagueness merely because it is not expressly defined in the relevant statutory scheme." (Citations omitted; internal quotation marks omitted.) *State* v. *DeCiccio*, 315 Conn. 79, 87–88, 105 A.3d 165 (2014).

## A

### Failure To Provide Notice

The defendant claims that § 53a-98 (a) (3) is unconstitutionally vague as applied to her because it gave her no notice that her inaction would meet the "refuses to return" element of that statute. She contends that the meaning of "refuses to return" is not statutorily defined and its meaning is not otherwise sufficiently clear or definite to satisfy the requirement of fair notice. The state argues that the defendant's "conviction was based on her affirmative, repeated statements that she would not send her children out to their father . . . ." It argues that the "refuses to return" element of § 53a-98 (a) (3) clearly encompasses the defendant's affirmative act of refusing to send out the children to CF when he requested their return. Accordingly, the state argues, the statute is not vague as applied.

To resolve the defendant's claim, we must determine whether the process of statutory interpretation reveals a core meaning for the phrase "refuses to return" such that a person of ordinary intelligence would be able to understand what action the statute prohibits. We first consider the language of § 53a-98 (a), which provides in relevant part: "A person is guilty of custodial interference in the second degree when . . . (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child." In this case, we are concerned only with the "refuses to return" element of the statute. The statute contains no definition of this phrase, and, therefore, it provides no guidance on the constitutional question raised by the defendant's claim. Accordingly, we must use other available

tools of statutory construction. We start with the common meaning of the words used in the statute. See, e.g., *State* v. *Moulton*, 310 Conn. 337, 358 n.19, 78 A.3d 55 (2013) ("Under General Statutes § 1-1 (a), '[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . .' We look to the dictionary definition of a term to ascertain its commonly approved usage.").

The American Heritage Dictionary of the English Language (5th Ed. 2011) defines "refuse" as "[t]o decline to do, accept, give or allow . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) defines "refuse" as "to express oneself as unwilling to accept" and "to show or express unwillingness to do or comply with . . . ." Black's Law Dictionary (9th Ed. 2009) defines "refusal" as "[t]he denial or rejection of something offered or demanded . . . ." The term "refuse" also has been discussed in our case law. In *State* v. *Corbeil*, 41 Conn. App. 7, 18–19, 674 A.2d 454, cert. granted on other grounds, 237 Conn. 919, 676 A.2d 1374 (1996) (appeal dismissed September 18, 1996), we considered the defendant's claim that General Statutes § 14-227a (f) was unconstitutionally vague as applied to him because the statute did not define adequately the term "refused." We rejected the defendant's claim and stated: "It is not necessary to define a word that carries an ordinary, commonly understood meaning, is commonly used and is defined in standard dictionaries. . . . The word refuse is defined as to show or express unwillingness to do or comply with . . . . Consequently, the dictionary definition makes it clear that refusing to take a breath test may be accomplished by a failure to cooperate as well as by express refusal." (Citations omitted; internal quotation marks omitted.) Id.; see *O'Rourke* v. *Commissioner of Motor Vehicles*, 156 Conn. App. 516, 525, 113 A.3d 88 (2015), quoting *State* v. *Corbeil*, supra, 18–19; *Bialowas* v. *Commissioner of Motor Vehicles*, 44 Conn. App. 702, 717 n.14, 692 A.2d 834 (1997), quoting *State* v. *Corbeil*, supra, 18–19; see also *Sanseverino* v. *Commissioner of Motor Vehicles*, 79 Conn. App. 856, 859, 832 A.2d 80 (2003) ("[r]efusal to take a breath test can occur through conduct as well as an expressed refusal" [internal quotation marks omitted]).

"Return" is defined as "to pass back to an earlier possessor," "to restore to a former or to a normal state," and "to give back to the owner." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1065. The American Heritage Dictionary, supra, defines "return" as "[t]o revert to a former owner," and "[t]o send, put, or carry back."

These common definitions provide us with the assurance that the legislature intended "refuses to return" to include, at its core, a person who has declined a demand to send back a child to his or her lawful custo-

dian. Given this clear meaning, we need not resort to any other aids in the interpretation of the meaning of "refuses to return" in § 53a-98 (a) (3). See General Statutes § 1-2z.

Despite the plain and ordinary meaning of "refuses to return," the defendant argues that the statute gave her no notice that her inaction of not forcing her children to return to their father could expose her to criminal liability. We reject the defendant's argument for two reasons. First, we disagree with the premise of the defendant's argument that she was charged with violating § 53a-98 (a) (3) due to inaction. To the contrary, the state's theory was that the defendant affirmatively refused to order her children to return to CF. It should be clear to a person of ordinary intelligence in the defendant's circumstances that affirmatively refusing to direct a child in her care to return to the custodial parent upon a request for the return of the child would constitute a refusal to return the child.

Second, even assuming that the defendant was prosecuted for inaction, we conclude that the plain meaning of the statute provides notice that some affirmative step to comply with the requested return of the children to their lawful custodian is required. Otherwise, a person could avoid the requirements of § 53a-98 (a) (3) simply by not answering the door or not responding to a request from the custodial parent that the child be returned. Any person of ordinary intelligence would understand that ignoring a request to return is the equivalent of an affirmative refusal to return and, therefore, prohibited by the plain language of the statute. Consistent with this analysis, this court, in a case involving civil theft and conversion, specifically rejected a claim that inaction cannot constitute a refusal to return. In *Rana* v. *Terdjanian*, 136 Conn. App. 99, 103, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d 886 (2012), $5133.95 that should have been deposited into the plaintiff's bank account was mistakenly deposited into the defendant's bank account. Despite being provided with proof beyond doubt that the funds at issue belonged to the plaintiff, the defendant failed to return the funds to the plaintiff. Id., 115. The plaintiff sued the defendant claiming that his failure to return to the plaintiff the wrongfully held funds constituted both common-law conversion and a violation of Connecticut's civil theft statute, General Statutes § 52-564. Id., 103–104. The trial court agreed and rendered judgment for the plaintiff, and the defendant appealed to this court. Id., 106–107. With respect to the judgment on the conversion count, the defendant argued that he could not be liable absent an " 'absolute and unqualified refusal' to return the plaintiff's funds." Id., 120. This court disagreed and concluded that the failure to return the funds after demand by the plaintiff "evinced his unqualified refusal to comply." Id., 121. Similarly, in the present case, it would be clear to any person in the defendant's situation that ignoring a

demand to return the children to their lawful custodian would constitute a refusal to return.

The evidence in this case, including from the defendant, was that the defendant refused to send out the children to their custodial parent. In particular, the evidence demonstrated that CF "went to pick . . . up [the children] on Memorial Day . . . according to [the] visitation schedule . . . and [the defendant] came out of her house and told [him] that *she wasn't sending the children out*. The children didn't want to come out, and *she was going to do what the children wanted to do*." (Emphasis added.) The defendant also later told Nash that she had not made the children go outside to CF because they did not want to go with CF. Consistent with this testimony, the defendant testified that she "wasn't making decisions for [her] children" and that she was "supporting whatever they needed." She further testified that the children "were convincing [her] of the reasons why they didn't want to go." Consequently, rather than exercising her parental authority over the children, the defendant chose not to make the decision whether the children had to go with CF, as required by the court order placing custody in CF, but, instead, decided to support whatever decision the children made. In her words, she let her children convince her why they should not have to go with their father. The statements of the defendant clearly indicate that she abdicated her parental role and made a conscious decision not to return the children to their custodial parent and then informed others of that decision by communicating that she would not make the children return to CF.

We conclude that the defendant's conduct falls within the core meaning of § 53a-98 (a) (3) and that the language of the statute provided clear notice to the defendant that "refuses to return" encompassed the behavior of a person who either affirmatively declines to return a child to his or her lawful custodian or declines to take any affirmative steps to return a child to the lawful custodian upon that custodian's request.

As noted previously in this opinion, the question of whether a statute is unconstitutionally vague as applied is a fact specific inquiry. Consequently, our conclusion is limited to the defendant's conduct at issue in this case, namely, refusing to take any steps whatsoever to require the children to return to CF. We do not address, for example, a situation in which the noncustodial parent instructs the child to return to the custodial parent and the child refuses or what other steps a noncustodial parent must take in similar circumstances to avoid criminal liability. Whether the statute is unconstitutionally vague as applied to such a situation will depend on the particular facts of that situation. In this case, the defendant does not claim that she ever instructed the children to return to CF or that they refused to comply

with such an instruction. She simply refused to make them go with CF because they told her that they did not want to go. Because a person of ordinary intelligence in the defendant's circumstances would understand that her abdication of any parental responsibility to return the children to the custodial parent violated the core meaning of the statute, her claim that § 53a-98 (a) (3) is unconstitutionally vague as applied to her fails.

B

Arbitrary and Discriminatory Enforcement

The defendant also claims that § 53a-98 (a) (3) is subject to arbitrary enforcement due to its vagueness and that it, therefore, impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges and juries on an ad hoc and subjective basis. She contends that her claim is demonstrated by the particular facts of this case, namely, that the Glastonbury police declined to charge her under the statute, that Nash initially declined to charge her under the statute, that the prosecutor dropped the charges as to R while proceeding with charges as to the remaining children, and that the state and the judge also appeared confused as to what conduct met the elements of § 53a-98 (a) (3). The state argues that there could not have been arbitrary and discriminatory enforcement in this case because the plain terms of § 53a-98 (a), illuminated by their dictionary definitions, provided sufficient guidance as to the behavior that is prohibited, and the statute has a core meaning within which the defendant's conduct clearly fell. We agree with the state.

The United States Supreme Court has emphasized that "the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." (Internal quotation marks omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).

"Our Supreme Court has instructed that [a]s a practical matter, a court analyzing an as-applied vagueness challenge may determine that the statute generally provides sufficient guidance to eliminate the threat of arbitrary enforcement without analyzing more specifically whether the particular enforcement was guided by adequate standards. In fact, it is the better (and perhaps more logical) practice to determine first whether the statute provides such general guidance, given that the [United States] Supreme Court has indicated that the

more important aspect of the vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . If a court determines that a statute provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement, that finding concludes the inquiry.

"[When] a statute provides insufficient general guidance, an as-applied vagueness challenge may nonetheless fail if the statute's meaning has a clear core. . . . In that case the inquiry will involve determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." (Internal quotation marks omitted.) *State* v. *Daniel G.*, 147 Conn. App. 523, 543–44, 84 A.3d 9, cert. denied, 311 Conn. 931, 87 A.3d 579 (2014). Having concluded in part I B that § 53a-98 (a) (3) provided sufficient guidance as to what is prohibited and that it has a clear core meaning within which the defendant's conduct fell, we need not address the particular enforcement of the statute in this case. See id.

The defendant has not demonstrated that § 53a-98 (a) (3) is impermissibly vague such that it deprived her of adequate notice or that she fell victim to arbitrary and discriminatory enforcement. Accordingly, we conclude that the defendant's claim that § 53a-98 (a) (3) is void for vagueness as applied to her fails under the third prong of *Golding*[4] because she failed to demonstrate the existence of a constitutional violation.

## II

The defendant next claims that there is insufficient evidence to support her conviction of three counts of custodial interference in the second degree. She contends that she did nothing to stop or prevent the children from going with their father, and that she, in fact, encouraged the police and others to speak with the children and made the children readily available to them. Specifically, she argues that "there is no evidence whatsoever of any conduct by the defendant that equated to holding, keeping, or refusing to return the children to their father."

The state argues that "[w]hat the defendant fails to understand is that her repeated refusal to send the children out to their father was 'specific action on [her] part' . . . that satisfied the 'otherwise refuse to return' element of . . . [custodial interference in the second degree]. The evidence introduced at trial . . . showed that the defendant three times refused to return her minor children to their father. First, she told [CF] that she wasn't sending [the] children out because they didn't want to go with him. . . . She then told Nash on two different occasions that she would not ask the children to go with their father, even after Nash advised

her that she could face criminal charges. . . . On the basis of these affirmative actions, the jury could have found beyond a reasonable doubt that the defendant refused to return her children to [CF]."[5] Although the evidence in this case is far from overwhelming, we conclude that it is sufficient to sustain the defendant's conviction.

We begin by setting forth the applicable standard of review. "In [a defendant's] challenge to the sufficiency of the evidence . . . [w]hether we review the findings of a trial court or the verdict of a jury, our underlying task is the same. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . .

"In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier [of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 157–58, 49 A.3d 962 (2012). "[A] defendant is entitled to a judgment of acquittal and retrial is barred if an appellate court determines that the evidence is insufficient to support the conviction." *State* v. *Padua*, 273 Conn. 138, 178, 869 A.2d 192 (2005).

We begin our analysis of this claim with an overview of the language of § 53a-98 (a), which provides in relevant part: "A person is guilty of custodial interference in the second degree when . . . (3) knowing that he has no legal right to do so, he holds, keeps or otherwise *refuses to return* a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child." (Emphasis added.)

Determining the required elements of a particular statute presents a question of statutory construction

over which we exercise plenary review. See, e.g., *State v. Drupals*, supra, 306 Conn. 159. "[W]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused. . . . [C]riminal statutes [thus] are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Rather, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create. . . . Further, if, after interpreting a penal provision, there remains any ambiguity regarding the legislature's intent, the rule of lenity applies. It is a fundamental tenet of our law to resolve doubts in the enforcement of a [P]enal [C]ode against the imposition of a harsher punishment." (Citations omitted; internal quotation marks omitted.) Id., 160.

To establish that the defendant was guilty of three counts of custodial interference in the second degree pursuant to § 53a-98 (a) (3), the state, in this instance, needed to prove beyond a reasonable doubt that, on May 25, 2015, the defendant (1) held, kept, or otherwise *refused to return* the children, L, T, and S, to their lawful custodian, CF, (2) that L, T, and S each were under the age of sixteen, (3) that CF had requested the return of each child, and (4) that the defendant knew she had no legal right to refuse to return L, T, and S to CF.[6] The parties agree that the only element at issue in this case is the otherwise *refuses to return* element.

The defendant contends that the state failed to prove beyond a reasonable doubt that she "otherwise refuse[d] to return" the children to CF because the state provided no evidence that she had anything to do with the children's refusal to go with him. She also argues that "there is not a scintilla of evidence to suggest that [she] in any way restricted her children's access to their father, prevented their return to him, or actively refused to allow [him] to assert his custody over their children." In support of her argument, she points to the fact that it is uncontested that neither Nash, members of the Glastonbury Police Department, nor the Department of Children and Families could get the children to go with CF because the children refused to go. The state does not contest any of these facts but, instead, argues that it satisfied the "otherwise refuses to return" element of § 53a-98 (a) (3) through the testimony of CF and Nash, both of whom stated that the defendant told them that she "was not sending the children out" to CF. The specific question we must answer in this case is whether the defendant's statements that she "was not sending the children out" are enough to satisfy the element of "otherwise refuses to return." We conclude that they are sufficient.

At trial, CF testified that he "went to pick . . . up [the children] on Memorial Day . . . according to [the]

visitation schedule . . . and [the defendant] came out of her house and told [him] that *she wasn't sending the children out*. The children didn't want to come out, and *she was going to do what the children wanted to do*." (Emphasis added.) The defendant also later told Nash that she had not made the children go outside to CF because they did not want to go with him. Consistent with this testimony, the defendant testified that she "wasn't making decisions for [her] children" and that she was "supporting whatever they needed." She further testified that the children "were convincing [her] of the reasons why they didn't want to go." From these statements the jury reasonably could have inferred that, although the defendant had the ability to compel her children to go with their father, she refused to take any steps to comply with the court's custody and visitation orders by returning the children to him upon his request.

Having thoroughly reviewed the entirety of the transcripts in this case, we are aware that the defendant testified in relevant part that when CF arrived to pick up the children on May 25, 2015, the children refused to go with him and that she in no way prevented them from going. She stated that she made the children readily accessible to the police and to others, but the children continued to refuse to go with CF. She also testified that she believed that forcing the children to go with their father "was not an option" because she did not want to hurt them physically, by attempting force.[7] She stated that, "as a mom, you have a certain amount of power to convince your children to do things," and so she essentially urged them to go, but "they just kept giving [her] reasons why they didn't want to go. And it just became to the point where [she] felt that [she] had an obligation to let their voices be heard, to let them talk to some people. [She] didn't refuse to let them go. They refused to go." She also stated that she did not believe that any amount of coercion would work. She opined that the children had planned this together, and she recognized that they were not "kids that [she] could pick up and buckle into their car seat[s] and make them go." She also explained that she was hesitant about the use of physical force because of a previous physical altercation that CF had with R and because of the involvement of the police and the Department of Children and Families. The defendant further stated that CF could have spoken with the children to try to resolve the matter, but he chose not to.

Other evidence before the jury showed that R had been living with the defendant since January, 2015, that all of the children had agreed together that they were going to refuse to go with CF, that one of the children e-mailed CF a couple of times telling him she did not want to return to his home, and that the children all refused to go with him when he arrived to pick them up on May 25, 2015. When the state asked L what

prompted the children to make this decision, she responded that they had "been wanting to not go for a while, so actually [they] just decided not to go with him." Other witnesses, including Nash, members of the Glastonbury Police Department, and the Department of Children and Families also admittedly could not persuade the children to go with CF because the children absolutely refused. CF also did not persuade the children to return home with him.

Nevertheless, our law is quite clear: "[E]vidence is not insufficient . . . because it is conflicting or inconsistent . . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses . . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Young*, 174 Conn. App. 760, 766, 166 A.3d 704, cert. denied, 327 Conn. 976, 174 A.3d 195 (2017).

In this case, both CF and Nash testified that the defendant stated to them that she *would not make* the children go with CF and that she was going to do what the children wanted. The defendant similarly testified that she was going to support the children's decision and was not going to make the decision for them. Clearly, such statements indicate that the defendant had the ability to take some action to return the children to CF but that she refused to do so. The defendant, herself, testified that, as a mom, she had a certain amount of power to convince her children to do things but that she decided to "let their voices be heard . . . ." We conclude that this evidence is sufficient to support her conviction of three counts of custodial interference in the second degree.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with and our policy of protecting the privacy interests of minor children, we decline to identify the children or others through whom the children's identities may be ascertained. See General Statutes § 54–86e.

[1] On May 25, 2015, R was thirteen years old, L and T were eleven years old, and S was nine years old.

[2] The defendant filed at least one motion to dismiss, a motion for a judgment of acquittal, and a motion for judgment notwithstanding the verdict.

[3] The defendant requests review of this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "To enable us to review a claim that a statute is vague as applied, the record must . . . reflect the conduct that formed the basis of the defendant's conviction." *State* v. *Indrisano*, 228 Conn. 795, 800, 640 A.2d 986 (1994). We conclude that the record in this case is adequate to enable our review.

[4] See footnote 3 of this opinion.

[5] The state points specifically to two pages of the transcripts in support of its argument. The first page is Nash's testimony that the first time he contacted the defendant by telephone after the children had refused to return home with CF, the defendant told him that "the kids didn't want to come out to [CF] . . . [and that] she won't make the children come out to him." The second page is Nash's testimony that he contacted the defendant one week after she had promised to return the children to school, and she told him she would not return them.

[6] The state specifically alleged in its amended long form information that

the defendant "did hold and keep for a protracted period and otherwise refused to return" L, T, and S to CF. Although the state charged the defendant in the conjunctive, it concedes that she did not hold or keep the children from CF, but only that she otherwise refused to return them.

[7] The state concedes that physical force is not required to comply with the statute.

———————————————