******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LORI T.*
(SC 20520)

McDonald, D'Auria, Mullins, Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 53a-98 (a) (3)), a person is guilty of custodial interference in the second degree when, "knowing that he [or she] has no legal right to do so, he [or she] holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child."

Convicted of three counts of custodial interference in the second degree, the defendant appealed. The defendant's children, who were under the age of sixteen years, were at her home for visitation over a holiday weekend. F, the defendant's former husband and the children's father, had sole physical and legal custody of the children, whereas the defendant had visitation rights. Over the weekend, the children decided that they did not want to go home with F at the end of the long weekend. When F went to the defendant's home to pick up the children in accordance with the visitation schedule, the defendant told F that she wasn't sending the children out. The defendant stated that the children didn't want to come out to F and that she was going to do what the children wanted to do. Thereafter, F summoned a local police officer, who went to the defendant's home. Although the officer did not arrest the defendant, he encouraged her to seek legal counsel and to pursue the matter in family court. After F returned to his home, he contacted the children's school resource officer, N, and informed him of the children's refusal to return to his home. Soon thereafter, N contacted the defendant and asked her why the children had not been returned to F, and she told N that she was not going to make the children return to F. The children had also been absent from school during this time, and N told the defendant that she could be in trouble if she did not get the children back into school. The defendant agreed to return the children to school, and N agreed not to seek a warrant for her arrest. When the children continued to be absent from school, N again contacted the defendant, who said that she would not return the children to school. N then obtained an arrest warrant. After the defendant was convicted, she appealed to the Appellate Court, claiming that § 53a-98 (a) (3) was unconstitutionally vague in its application to her and that there was insufficient evidence to support her conviction. The Appellate Court rejected both claims and affirmed the judgment of conviction. On the granting of certification, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on her unpreserved claim that § 53a-98 (a) (3) was unconstitutionally vague as applied to her, the defendant having failed to demonstrate the existence of a constitutional violation under the third prong of the test set forth in *State* v. *Golding* (213 Conn. 233):

   a. The defendant could not prevail on her claim that § 53a-98 (a) (3) was unconstitutionally vague as applied to her on the ground that it gave her no notice that her inaction in connection with the return of her children to F would satisfy the "refuses to return" element of the statute:

   The "refuses to return" element of § 53a-98 (a) (3) may be satisfied when a person either affirmatively refuses to send or deliver a child back to the child's lawful custodian or declines to take any affirmative action to send or deliver a child back to the child's lawful custodian, after such custodian has requested the return of the child, as the plain meanings of the words "refuse" and "return," as gleaned from standard dictionaries, clearly impose an affirmative obligation on an individual to take some action to comply with a custodian's request to return a child, and, accordingly, refusing to return a child to the child's custodian may be demonstrated by affirmative action or a passive refusal to act.

   Allowing an individual to escape the requirements of § 53a-98 (a) (3)

simply by ignoring requests from a child's custodian would plainly lead to an absurd result that the legislature could not have intended.

This court clarified that § 53a-98 (a) (3) does not require an individual to compel a child to return to the child's lawful custodian but, rather, requires an individual to use efforts commensurate with the situation to avoid prosecution under that statute, and the efforts required in any given situation will vary and be dependent on any number of facts and considerations, including, without limitation, the age of the child and the relationship between the child and the individual required to return the child to the child's custodian.

There was no merit to the defendant's claim that, even if § 53a-98 (a) (3) required some form of action, a person of ordinary intelligence in the defendant's position would not reasonably have known that she was engaged in prohibited conduct insofar as § 53a-98 and case law are silent on precisely what action is required to return a child, as any person of ordinary intelligence would understand that failing to take any action upon a request to return is the equivalent of an affirmative refusal to return and, therefore, prohibited by the plain language of § 53a-98 (a) (3).

Accordingly, this court concluded that the defendant's conduct fell within the core meaning of § 53a-98 (a) (3), that the language of that statute provided notice to the defendant that the "refuses to return" element of the statute encompassed the behavior of an individual who, like the defendant, declines to take any action to send a child back to the child's lawful custodian, and that a person of ordinary intelligence would understand that ignoring a request to return is the equivalent of an affirmative refusal to return and is therefore prohibited by the plain language of the statute.

b. The defendant could not prevail on her claim that § 53a-98 (a) (3) is unconstitutionally vague because it is subject to arbitrary and discriminatory enforcement and that it, therefore, impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges and juries on an ad hoc and subjective basis:

There was no risk of arbitrary or discriminatory enforcement in the present case insofar as the plain terms of § 53a-98 (a) (3) provided sufficient guidance as to what conduct is prohibited and insofar as the statute has a core meaning within which the defendant's conduct fell.

The fact that F's local police department charged the defendant with violating § 53a-98 (a) (3) but the defendant's local police department declined to do so did not necessarily demonstrate arbitrary or discriminatory enforcement but, rather, the exercise of discretion, and the defendant did not point to anything in the record that would support the conclusion that the police department that declined to charge the defendant believed that § 53a-98 (a) (3) was inapplicable to the defendant.

2. There was sufficient evidence to prove that the defendant "refuse[d] to return" her children to F within the meaning of § 53a-98 (a) (3) and to support her conviction:

The evidence having established that the defendant told F, when he came to pick up the children, that she was not sending the children out of her house, that the children did not want to come out of the house, and that she was going to do what the children wanted to do, and the defendant having testified that she had told N that she did not make the children go outside to F because they did not want to go with him, that she was "supporting whatever [the children] needed," and that the children had "convince[d] [her] of the reasons why they [did not] want to go," the jury reasonably could have inferred that the defendant had refused to take any steps to return the children to F upon his request and, instead, had affirmatively abdicated her parental responsibility by allowing the children to decide whether to comply with the defendant and F's custody and visitation order.

To the extent that the defendant claimed that her testimony reflected that she did not prevent the children from going with F and that she essentially urged them to go with F, the jury was not required to accept the defendant's version of events, and certain of the defendant's other testimony undermined the testimony that could be construed to indicate that she had urged the children to go with F.

Although certain evidence demonstrated that the children had agreed that they were going to refuse to go with F, that evidence focused on the actions of the children and other individuals, rather than the defendant, and the evidence, viewed in the light most favorable to sustaining the verdict, demonstrated that the defendant refused to do anything but follow the will of her children.

Argued April 25—officially released October 18, 2022

*Procedural History*

Substitute information charging the defendant with three counts of the crime of custodial interference in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Prescott, Bright* and *Devlin, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*James P. Sexton*, assigned counsel, with whom were *Megan L. Wade*, assigned counsel, and, on the brief, *John R. Weikart*, assigned counsel, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Justina Moore*, assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. In this certified appeal, we must examine the meaning of certain language used in General Statutes § 53a-98 (a) (3), a provision that criminalizes custodial interference. Specifically, we must determine whether the actions, or inactions, of the defendant, Lori T., were sufficient to satisfy the "otherwise refuses to return a child" aspect of custodial interference in the second degree. General Statutes § 53a-98 (a) (3). The defendant appeals from the judgment of the Appellate Court, affirming the judgment of conviction, rendered after a jury trial, of three counts of custodial interference in the second degree. See *State* v. *Lori T.*, 197 Conn. App. 675, 677, 696, 232 A.3d 13 (2020). On appeal, the defendant claims that the Appellate Court incorrectly concluded that § 53a-98 (a) (3) is not unconstitutionally vague as applied to her and that the evidence was sufficient to support her conviction. See id., 677. We affirm the judgment of the Appellate Court.

The Appellate Court's opinion, as supplemented by the record, sets forth the facts and procedural history; see id., 677–80; which we summarize in relevant part. The defendant's four children, R, L, T and S, were at the defendant's home in Glastonbury for visitation over the Memorial Day weekend in 2015. At the time, the children ranged in age from nine to thirteen years old. The defendant's ex-husband, the children's father, had sole physical and legal custody of the children, and the defendant had visitation rights.[1] R, however, had been staying with the defendant for several months following a physical incident between him and his father, in which the Norwalk Police Department and the Department of Children and Families had been involved.

Over the Memorial Day weekend, the children decided that they did not want to go home with their father at the end of the long weekend. During the weekend, the father received emails from one of the children telling him that she did not want to return to his home and that she wanted to stay at the defendant's home. Pursuant to the custody and visitation order, the father went to the defendant's house to pick up the children on Memorial Day, but, when he arrived, "[the defendant] came out of her house and told [the father] that she wasn't sending the children out. The children didn't want to come out, and she was going to do what the children wanted to do." The father did not call the children or go inside to speak with them; rather, he went directly to the Glastonbury Police Department. Thereafter, Officer Brian Barao of the Glastonbury Police Department went to the defendant's home to conduct a welfare check of the children. After speaking with each child, Barao determined that the children were fine. He did not arrest the defendant, but, instead, he encouraged her to seek legal counsel and to pursue

these matters with the family court.

The father returned to his home in Norwalk and contacted the children's school resource officer, Officer Jermaine Nash of the Norwalk Police Department. He informed Nash of the children's refusal to return to his home. A few days later, Nash called the defendant and asked her why the children had not been returned to their father. The defendant told Nash that she "[was] not going to make" the children return with their father. Nash also testified at trial that the defendant said that "the [children] didn't want to come out to [their father]. And then [Nash] made a comment, from [his] understanding, that . . . if [the defendant is] the adult, why didn't [she] send them out, and [the defendant] stated that she will not do that. She won't make the children come out to [their father]." Because the children had also been absent from school during this time, Nash told the defendant that she could be in trouble if she did not get the children back into school. The defendant agreed to return the children to school, and Nash agreed not to seek a warrant for her arrest. When the children continued to be absent from school for an additional week, Nash again contacted the defendant, who said that she would not return the children to school. Nash then obtained an arrest warrant on one charge of custodial interference in the second degree, and he contacted the Department of Children and Families.

Thereafter, on June 2, 2015, Nash and Officer David Hoover of the Glastonbury Police Department went to the defendant's home to execute the arrest warrant, and the defendant was taken into custody. In addition to the defendant, the defendant's aunt, the father, the four children, and the defendant's son from a prior marriage were also at the scene. L testified that Nash threatened her and the other children "by telling [them that], if [they] didn't go back to [their] father, [Nash] would . . . pick [them] up and forcibly take [them] outside." T stated that Nash was "yelling" and described him as "kind of harsh . . . ." After placing the defendant into custody, both Hoover and Nash tried to persuade the children to go with their father but were unsuccessful. As a result, Hoover called the Department of Children and Families, explained that he was "having a problem [with the] placement of the children," and arranged a meeting for that day at its Manchester office. Hoover then drove the children to the Manchester office. After the children continued to refuse to go with their father, the Department of Children and Families issued a ninety-six hour hold, and the defendant's aunt was granted temporary custody of the children, who were later placed by the department with their maternal grandmother, with whom they resided for several months, until they reunited with their father.

The state's long form information dated July 5, 2016, charged the defendant with four counts of custodial

interference in the second degree, one count for each child. Prior to jury selection, the state dropped the charge as to R, the child who had been staying with the defendant for several months, and proceeded to trial on the three remaining counts. In its operative long form information, the state charged the defendant in count one, in relevant part: "The [s]tate of Connecticut accuses [the defendant] of [c]ustodial [i]nterference in the [s]econd [d]egree and charges that, [in] the city of Glastonbury, on or about May 25, 2015 [Memorial Day], at approximately 7:30 [p.m.] . . . the . . . [defendant] did . . . hold and keep for a protracted period and otherwise refused to return a child, to wit: [L], who was less than sixteen years old, to such child's lawful custodian, to wit: [the father] . . . after a request by such custodian for the return of such child, knowing that she had no legal right to do so, in violation of . . . § 53a-98 (a) (3)." The remaining counts contained similar allegations regarding T and S. At trial, the state's theory of the case focused on the defendant's alleged refusal to return the children to their father. At the conclusion of trial, the jury found the defendant guilty on all three counts. The trial court sentenced the defendant to a total effective term of three years of imprisonment, execution suspended after ninety days, three years of probation, and a $1500 fine.

From the trial court's judgment of conviction, the defendant appealed to the Appellate Court. The defendant argued that § 53a-98 (a) (3) is unconstitutionally vague in its application to her and that there was insufficient evidence to support her conviction of three counts of custodial interference in the second degree. See *State* v. *Lori T.*, supra, 197 Conn. App. 677. The Appellate Court rejected both claims and affirmed the judgment of conviction. See id., 677, 696. With respect to the vagueness claim, the Appellate Court concluded that "the defendant's conduct falls within the core meaning of § 53a-98 (a) (3) and that the language of the statute provided clear notice to the defendant that 'refuses to return' encompassed the behavior of a person who either affirmatively declines to return a child to his or her lawful custodian or declines to take any affirmative steps to return a child to the lawful custodian upon that custodian's request." Id., 687. As to the insufficiency of the evidence claim, the Appellate Court explained that "both [the father] and Nash testified that the defendant stated to them that she would not make the children go with [their father] and that she was going to do what the children wanted. The defendant similarly testified that she was . . . support[ing] the children's decision and was not . . . mak[ing] the decision for them. Clearly, such statements indicate that the defendant had the ability to take some action to return the children to [their father] but that she refused to do so. The defendant, herself, testified that, as a [mother], she had a certain amount of power to convince her children to

do things but that she decided to 'let their voices be heard . . . .' " (Emphasis omitted.) Id., 696.

Thereafter, the defendant filed a petition for certification to appeal, which we granted, limited to the following two issues: (1) "Did the Appellate Court incorrectly conclude that . . . § 53a-98 (a) (3) was not unconstitutionally vague as applied to the defendant?" And (2) "[d]id the Appellate Court incorrectly conclude that the evidence presented was sufficient to prove that the defendant 'otherwise refuse[d] to return' her children?" *State* v. *Lori T.*, 335 Conn. 956, 239 A.3d 319 (2020).

I

We begin with the defendant's contention that the Appellate Court incorrectly concluded that § 53a-98 (a) (3) is not unconstitutionally vague in its application to her. See *State* v. *Lori T.*, supra, 197 Conn. App. 677, 689–90. Specifically, she argues that the statute fails to define what it means for someone to "otherwise [refuse] to return a child" to his or her lawful custodian, and, as a result, it was impossible, under the facts of this case, for the defendant to know that her failure to force the children to go with their father could amount to a refusal to return under the statute. The defendant also contends that the Appellate Court misapplied the clear core exception to save the statute from the vagueness challenge; see *State* v. *Lori T.*, supra, 687, 689; because, she asserts, the Glastonbury Police Department doubted the statute's application and, thus, the exception does not apply. Additionally, she argues that the vagueness of the statute impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges, and juries on an ad hoc and subjective basis, and, therefore, the statute is subject to arbitrary and discriminatory enforcement.

The defendant concedes that she failed to preserve this claim and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We conclude that the defendant's claim is reviewable because the record is adequate for review and the defendant raises a claim that is constitutional in nature insofar as it implicates her due process rights. See *State* v. *Golding*, supra, 239.

"The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary

and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness [because] [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Citation omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010).

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that [people are] free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [police officers], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement." (Internal quotation marks omitted.) *Gonzalez* v. *Surgeon*, 284 Conn. 573, 584, 937 A.2d 24 (2007).

"Tempering the foregoing considerations is the acknowledgment that many statutes proscribing criminal offenses necessarily cannot be drafted with the utmost precision and still effectively reach the targeted behaviors. Consistent with that acknowledgment, the United States Supreme Court has explained: 'The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.' *Colten* v. *Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972) . . . ." (Citations omitted.) *State* v. *Winot*, supra, 294 Conn. 760. "Simply put, [although] some ambiguous statutes are the result of poor draftsmanship, it is apparent that in many instances the uncertainty is merely attributable to a desire not to nullify the purpose of the legislation by the use of specific terms which would afford loopholes through which many could escape." (Internal quotation marks omit-

ted.) Id., 760–61.

"Finally, even though a statutory term that is suscepti-
ble to a number of differing interpretations may be
impermissibly vague as applied to some situations, the
term is not necessarily vague as applied in all cases;
rather, whether the statute suffers from unconstitu-
tional vagueness is a case-specific question, the resolu-
tion of which depends on the particular facts involved.
. . . Similarly, a term is not void for vagueness merely
because it is not expressly defined in the relevant statu-
tory scheme." (Citation omitted.) *State* v. *DeCiccio*, 315
Conn. 79, 88, 105 A.3d 165 (2014).

A

We turn first to the defendant's claim that § 53a-98
(a) (3) is unconstitutionally vague as applied to her
because it gave her no notice that her inaction would
meet the "refuses to return" element of the statute.
Specifically, she claims that the phrase "otherwise
refuses to return" in § 53a-98 (a) (3) is ambiguous and
leads to unworkable results. The defendant also claims
that, because the meaning of "otherwise refuses to
return" is not further refined by extratextual sources,
the rule of lenity requires reversal. The state argues
that, because the term "refuses to return" is not defined
in § 53a-98 or elsewhere in the General Statutes, the
Appellate Court properly applied the ordinary diction-
ary definitions in construing the statute. See *State* v.
*Lori T.*, supra, 197 Conn. App. 683–84. The state con-
tends that "refuses to return" has a clear meaning when
those definitions are applied to that phrase, and, as a
result, the defendant cannot prove that she did not have
fair notice that her conduct was prohibited by § 53a-
98. The state argues that, in this case, the defendant
clearly demonstrated and affirmatively expressed her
unwillingness to return the children to their father when
she stated, three times, that she would not turn the
children over to the father. In short, the state claims
that the defendant failed to exercise her parental
authority over her children and, instead, allowed the
children to make the decision whether to comply with
the custody and visitation order, thus abrogating her
obligation under that order to share custody with the
father. We agree with the state.

We begin our analysis of the defendant's vagueness
claim by applying our familiar principles of statutory
interpretation to determine the meaning of the phrase
"otherwise refuses to return." See, e.g., *Vitti* v. *Milford*,
336 Conn. 654, 660, 249 A.3d 726 (2020). In doing so,
we are mindful that, pursuant to General Statutes § 1-
1 (a), "[i]n the construction of the statutes, words and
phrases shall be construed according to the commonly
approved usage of the language; and technical words
and phrases, and such as have acquired a peculiar and
appropriate meaning in the law, shall be construed and
understood accordingly." "References to judicial opin-

ions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine [whether] it gives fair warning." (Internal quotation marks omitted.) *State* v. *Josephs*, 328 Conn. 21, 31–32, 176 A.3d 542 (2018).

Section 53a-98 (a) provides in relevant part: "A person is guilty of custodial interference in the second degree when . . . (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child." The "refuses to return" aspect of the statute is the only aspect at issue in this case. Because § 53a-98 does not define the phrase "refuses to return," we look to the common meaning of the words used in the statute. See, e.g., *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 677–78, 911 A.2d 300 (2006).

As the Appellate Court noted, The American Heritage Dictionary of the English Language defines "refuse" as "[t]o decline to do, accept, give, or allow . . . ." The American Heritage Dictionary of the English Language (5th Ed. 2011) p. 1478. Merriam-Webster's Collegiate Dictionary defines "refuse" as "to express oneself as unwilling to accept" or "to show or express unwillingness to do or comply with . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 1047. Black's Law Dictionary defines "refusal" as "[t]he denial or rejection of something offered or demanded . . . ." Black's Law Dictionary (9th Ed. 2014) p. 1472. Because the question of whether a statute provides fair warning may also be ascertained by reference to other provisions in the penal code; see General Statutes § 53a-2; Appellate Court case law interpreting the meaning of the word "refused" in other criminal contexts is also instructive. The Appellate Court has rejected an argument that a statute pertaining to the refusal to submit to a breathalyzer test was unconstitutionally vague as applied because the statute did not adequately define "refused." *State* v. *Corbeil*, 41 Conn. App. 7, 17–19, 674 A.2d 454, cert. granted, 237 Conn. 919, 676 A.2d 1374 (1996) (appeal dismissed, September 18, 1996). The court explained that "[i]t is not necessary to define a word that carries an ordinary, commonly understood meaning, is commonly used and is defined in standard dictionaries. . . . The word 'refuse' is defined as 'to show or express unwillingness to do or comply with . . . .' " (Citation omitted.) Id., 18–19. "Consequently, the dictionary definition makes it clear that 'refusing' to take a breath test may be accomplished by a failure to cooperate as well as by an expressed refusal."[2] Id., 19.

"Return" is defined as "to pass back to an earlier possessor," "to restore to a former or to a normal state," or "to give back to the owner . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 1065. The Ameri-

can Heritage Dictionary of the English Language defines "return" as "[t]o revert to a former owner" or "[t]o send, put, or carry back . . . ." The American Heritage Dictionary of the English Language, supra, p. 1500. The verb form of the word "return," in our view, unquestionably denotes some level of action or activity required on the part of the subject: the child must be returned.

We conclude that the "otherwise refuses to return" element of § 53a-98 (a) (3) applies, at its core, to a person who either affirmatively refuses to send or deliver a child back to his or her lawful custodian or who declines to take any affirmative action to send or deliver a child back to his or her lawful custodian, after such custodian has requested the return of the child. Indeed, the plain meanings of the words "refuse" and "return," taken together, clearly impose an affirmative obligation on an individual to take some action to comply with a custodian's request for the return of a child. See, e.g., Merriam-Webster's Collegiate Dictionary, supra, p. 1047 (defining "refuse" as "to show or express *unwillingness to do* or comply with" (emphasis added)); id., p. 1065 (defining "return" as "to *give back* to the owner" (emphasis added)). As a result, refusing to send the child back to his or her lawful custodian may be evinced by either affirmative action or a passive refusal to act. Cf. *State* v. *Corbeil*, supra, 41 Conn. App. 18–19. If a refusal to return could not be evinced by action or inaction, a person could avoid the requirements of § 53a-98 (a) (3) simply by ignoring requests from the child's lawful custodian that the child be returned. Cf. *Rana* v. *Terdjanian*, 136 Conn. App. 99, 121, 46 A.3d 175 (defendant's failure to return funds after demand by plaintiff's agent "evinced [the defendant's] unqualified refusal to comply" and was sufficient to establish common-law conversion), cert. denied, 305 Conn. 926, 47 A.3d 886 (2012). Allowing an individual to escape the requirements of the statute simply by ignoring requests from a child's custodian would plainly lead to an absurd result that the legislature could not have intended. We agree with the Appellate Court that "[a]ny person of ordinary intelligence would understand that ignoring a request to return is the equivalent of an affirmative refusal to return and, therefore, prohibited by the plain language of the statute." *State* v. *Lori T.*, supra, 197 Conn. App. 685.

In one portion of its opinion, however, the Appellate Court explained that the jury could have concluded that, "although the defendant had the ability to *compel* her children to go with their father, she refused to take any steps to comply with the [trial] court's custody and visitation orders by returning the children to him upon his request." (Emphasis added.) Id., 694. To the extent that the Appellate Court suggests that § 53a-98 (a) (3) imposes a requirement that an individual "compel" a child to return to his or her lawful custodian, we disagree. A "compel" requirement is too strong of a charac-

terization of an individual's obligation under the statute. Rather, we conclude that an individual is required to use efforts commensurate with the situation to satisfy the requirements of § 53a-98 (a) (3). The effort required in any given situation, and whether an individual has satisfied the mandates of § 53a-98 (a) (3), will vary and be dependent on any number of facts and considerations, including, without limitation, the age of the child and the relationship between the individual and the child. As the defendant conceded in her brief and at oral argument, parents of a young child may have an obligation to physically pick up their recalcitrant child and carry the child to the car, buckle the child in a car seat, drive the child to a mutual exchange location, or take some other action to physically return the child to his or her lawful custodian.[3] Although parents of an older child may not have the same ability to physically move their child, the acknowledgment that parents of a young child may need to physically return the child highlights the obligation of a parent to do *something* to effectuate the return of the child, regardless of the child's age.[4] For parents of an older child, there may be fewer coercive measures at their disposal, beyond verbal commands, but there is still an obligation to do something to effectuate the return of the child. However, the successful return of the child to his or her lawful custodian may not be necessary to satisfy the requirements of § 53a-98 (a) (3).[5] See footnote 2 of this opinion. Because, as we will explain, the defendant took no steps to return the children to their father, we need not decide, in this case, the more difficult question of what additional steps an individual may be required to take when he or she has taken some action to return the children but the children do not comply.

We note that other states have similar statutes that criminalize the failure to return a child because it amounts to custodial interference. See, e.g., *State* v. *Petruccelli*, 170 Vt. 51, 60, 743 A.2d 1062 (1999) ("[c]ustodial interference, by comparison, generally occurs when a parent takes his or her child, or *fails to return the child* following a court-ordered visitation period, in a manner that prevents the other custodial parent from having contact with the child" (emphasis added)); see also, e.g., Ariz. Rev. Stat. Ann. § 13-1302 (A) (2020) ("[a] person commits custodial interference if, knowing or having reason to know that the person has no legal right to do so, the person . . . [4] [a]t the expiration of access rights outside this state, *intentionally fails or refuses to return or impedes the return of a child to the lawful custodian*" (emphasis added)); Minn. Stat. Ann. § 609.26 (1) (West Cum. Supp. 2021) ("[w]hoever intentionally does any of the following acts may be charged with a felony and, upon conviction, may be sentenced as provided in subdivision 6 . . . takes, obtains, retains, or *fails to return a minor child* from or to the parent in violation of a court order, where the

action manifests an intent substantially to deprive that parent of rights to parenting time or custody" (emphasis added)); N.M. Stat. Ann. § 30-4-4 (B) (2015) ("[c]ustodial interference consists of any person, having a right to custody of a child, maliciously taking, detaining, concealing or enticing away or *failing to return that child* without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his right to custody" (emphasis added)).

Although the appellate courts of Connecticut have not previously addressed a parent's failure to act in the custodial interference context, we find the rationale of certain out-of-state courts, in related contexts, instructive. For example, the Colorado Court of Appeals has explained that the "[d]efendant was under a duty, recognized by the laws of [Colorado], to return the children at the time prescribed in the custody determination. [In the absence of] consent from the custodial parent, *his failure to so act is conduct for which he may be prosecuted* . . . ." (Emphasis added.) *People* v. *Haynie*, 826 P.2d 371, 374 (Colo. App. 1991). Similarly, the Supreme Court of Vermont has explained that, "[a]lthough most crimes are committed by an affirmative act, under some circumstances a failure to act can result in criminal liability. . . . To face criminal liability for a failure to act, however, a person must have been bound by a legal duty to act. . . . Here, [the] defendant had a legal duty under a court order to return the child to her lawful custodian in Vermont. . . . [When] there is a legal duty to act, failure to perform that duty is, for the purpose of jurisdiction, tantamount to an act." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Doyen*, 165 Vt. 43, 47–48, 676 A.2d 345 (1996).

Similarly, in the contempt context, courts have concluded that a parent's refusal to take any steps to facilitate visitation supports a finding of contempt. For example, the North Dakota Supreme Court reviewed a father's appeal from the trial court's order for structured visitation and finding that he deliberately and persistently interfered with the mother's visitation. See *Sisk* v. *Sisk*, 711 N.W.2d 203, 206 (N.D. 2006). The initial custody stipulation gave the father physical custody of the children and provided the mother with reasonable and liberal visitation as agreed on. Id., 205. The mother had little contact for some time and, when the mother attempted to reinstitute contact, the children often refused to speak with her. Id. The father did not require or encourage the children to talk with their mother. Id. When the mother requested visitation, the children declined, and the father did not require their participation. Id. The father claimed that he made the children available to the mother, but he did not encourage or require them to cooperate when they resisted or refused visitation. Id. The North Dakota Supreme Court held: "We believe [that] the evidence supports the trial court's

finding that [the father] has deliberately and intentionally interfered with visitation through his delay tactics, *failure to cooperate, and refusal to in any way facilitate visitation between his children and their mother.*" (Emphasis added.) Id., 210. The court went on to note that, "[b]y [the father's] own admission, his conduct is deliberate and intentional. He does not feel he needs to do anything to facilitate visitation." Id., 212; see also, e.g., *Ware* v. *Ware*, Docket No. CA2001-10-089, 2002 WL 336957, *2 (Ohio App. March 4, 2002) (when court establishes visitation schedule concerning parties' minor children, in absence of proof that visitation with noncustodial parent would cause physical or mental harm to children, or showing of some justification for preventing visitation, custodial parent must do more than merely encourage minor children to visit noncustodial parent). Similarly, the Nebraska Supreme Court has held that a parent cannot abdicate her parental obligation by transferring responsibility for deciding whether to attend visitation to her child. See *Martin* v. *Martin*, 294 Neb. 106, 119, 881 N.W.2d 174 (2016) (upholding trial court's decision to hold custodial parent in contempt when parent consistently transferred responsibility of deciding whether to attend visitation to children and noncustodial parent was unable to exercise his court-ordered visitation).

These out-of-state cases lend further support to our conclusion that the "otherwise refuses to return" aspect of § 53a-98 (a) (3) includes, at its core, a person who declines to take any action to send or deliver a child back to his or her lawful custodian, after such custodian has requested the return of the child.

In this case, the evidence, including from the defendant herself, established that the defendant refused to send the children out of her home to the father or to take any action whatsoever to facilitate the return of the children to their father. Specifically, when the father went to pick up the children on Memorial Day, pursuant to the custody and visitation order, "[the defendant] came out of her house and told [the father] that *she wasn't sending the children out.* The children didn't want to come out, and *she was going to do what the children wanted to do.*"[6] (Emphasis added.) Later, the defendant also told Officer Nash that "[she wasn't] sending the [children] to [their father] and [she was] not going to make them [go]." Officer Nash further testified that the defendant said that "the [children] didn't want to come out to [their father]. And then [Nash] made a comment . . . that . . . if [the defendant is] the adult, why didn't [she] send them out, and [the defendant] stated that she will not do that. She won't make the children come out to [their father]." The father testified that he "didn't learn that [the children] didn't want to go with [him] until [he] arrived at [the defendant's] house that evening, and [the defendant] came out of [her] house to tell [him] that [the children] weren't

coming out, and [she wasn't] bringing them out." The defendant testified that she "wasn't making decisions for [her] children. [She] was supporting whatever they needed," and the children "were convincing [her] of the reasons why they didn't want to go." In short, the defendant abdicated her parental responsibility and allowed the children to decide whether to comply with the custody and visitation order.

The defendant nevertheless contends that, even if some action was required by § 53a-98 (a) (3), "because the statute and our case law are silent on precisely *what* action is required [to return the children], a person of ordinary intelligence in the defendant's position would not reasonably have known that she was engaged in [conduct that was] statutorily prohibited . . . ." (Emphasis in original.) We are not persuaded. As we explained, the defendant took no action to facilitate the return of the children. This is not a situation in which the defendant instructed her children to go with their father and they simply refused. Rather, the defendant repeatedly and affirmatively refused to do anything except follow the will of her children. Moreover, "[d]ue process does not require statutes to provide a laundry list of prohibited conduct. [L]aws may be general in nature so as to include a wide range of prohibited conduct. The constitution requires no more than a reasonable degree of certainty." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 725, 998 A.2d 1 (2010). Indeed, "[t]he proscription of the activity . . . need not be definite as to all aspects of its scope. A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions." (Internal quotation marks omitted.) *State* v. *Panek*, 328 Conn. 219, 244, 177 A.3d 1113 (2018). In this case, the defendant was not required to "inquire further" because her failure to take any action fell squarely within the core meaning of § 53a-98 (a) (3). Any person of ordinary intelligence would understand that failing to take any action upon a request to return is the equivalent of an affirmative refusal to return and, therefore, prohibited by the plain language of the statute.

We agree with the Appellate Court that the defendant's conduct falls within the core meaning of § 53a-98 (a) (3) and that the language of the statute provided notice to the defendant that the "refuses to return" element of the statute encompassed the behavior of an individual who either affirmatively refuses to send a child back to his or her lawful custodian or declines to take any action to send a child back to his or her lawful custodian after such a request. See *State* v. *Lori T.*, supra, 197 Conn. App. 687. It would be clear to a person of ordinary intelligence in the defendant's circumstances that her abdication of parental responsibility to return the children to their father violated the core meaning of the statute, and, consequently, the defen-

dant's claim that § 53a-98 (a) (3) is unconstitutionally vague, as applied to her, fails.

B

The defendant next claims that § 53a-98 (a) (3) is unconstitutionally vague because it is subject to arbitrary and discriminatory enforcement and that it, therefore, impermissibly delegates the resolution of the definition of the phrase "refuses to return" to police officers, judges and juries on an ad hoc and subjective basis. The defendant further claims that the facts of this case highlight the arbitrary and discriminatory enforcement. Specifically, she contends that the contradictory enforcement of the statute by the Glastonbury Police Department and the Norwalk Police Department evidences the arbitrary enforcement. The state contends that "there is no risk of arbitrary or discriminatory enforcement in this case because the plain terms of § 53a-98 [a] [3] provide sufficient guidance as to what is prohibited, and because the statute has a core meaning within which the defendant's conduct fell." (Internal quotation marks omitted.) We agree with the state.

To prevent arbitrary and discriminatory enforcement, "laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [police officers], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (Footnote omitted.) *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "[A] legislature [must] establish minimal guidelines to govern law enforcement. . . . [When] the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows [police officers], prosecutors, and juries to pursue their personal predilections." (Citation omitted; internal quotation marks omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

"As a practical matter, a court analyzing an as-applied vagueness challenge may determine that the statute generally provides sufficient guidance to eliminate the threat of arbitrary enforcement without analyzing more specifically whether the particular enforcement was guided by adequate standards. In fact, it is the better (and perhaps more logical) practice to determine first whether the statute provides such general guidance, given that the [United States] Supreme Court has indicated that the more important aspect of the vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . If a court determines that a statute provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement, that finding concludes the inquiry.

"[When] a statute provides insufficient general guidance, an as-applied vagueness challenge may nonethe-

less fail if the statute's meaning has a clear core. . . . In that case the inquiry will involve determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." (Internal quotation marks omitted.) *State* v. *Stephens*, 301 Conn. 791, 805–806, 22 A.3d 1262 (2011).

Given our conclusion in part I A of this opinion that § 53a-98 (a) (3) has a clear core meaning and that the defendant's conduct fell within this core, we agree with the Appellate Court that we need not address the particular enforcement of the statute in this case. See *State* v. *Lori T.*, supra, 197 Conn. App. 689; see also, e.g., *State* v. *Stephens*, supra, 301 Conn. 806.

We do, however, briefly address one misconception underlying the defendant's contention, namely, that she was the victim of arbitrary and discriminatory enforcement because the Norwalk Police Department charged her under the statute and the Glastonbury Police Department declined to do so. The different approaches taken by the two police departments do not necessarily demonstrate arbitrary or discriminatory enforcement but, rather, the exercise of discretion. Cf. 4 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 13.2 (b), p. 144 ("it is clear beyond question that discretion is regularly exercised by the police in deciding when to arrest"). Specifically, Barao, of the Glastonbury Police Department, exercised discretion in declining to press charges against the defendant, despite the fact that the Glastonbury Police Department has made arrests for custodial interference in other circumstances, instead suggesting that the parties first try to resolve their custody dispute in family court.[7] Similarly, Nash, of the Norwalk Police Department, also exercised discretion when he initially declined to pursue an arrest warrant after the defendant promised to return her children to school. The defendant does not point to anything in the record that supports the conclusion that the Glastonbury Police Department or Nash, when he initially declined to pursue an arrest warrant, believed § 53a-98 (a) (3) was inapplicable to the defendant.

The defendant has not established that § 53a-98 (a) (3) is unconstitutionally vague as applied such that it deprived her of adequate notice or that she was subject to arbitrary and discriminatory enforcement. Accordingly, we conclude that the defendant's claim fails under the third prong of *Golding* because she failed to demonstrate the existence of a constitutional violation. See *State* v. *Golding*, supra, 213 Conn. 240; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

II

We next turn to the defendant's contention that there was insufficient evidence to prove that she "otherwise refuse[d] to return" her children. General Statutes § 53a-98 (a) (3). The defendant argues that, by concluding that the defendant's statements and inaction "indicate that [she] had the ability to take some action to return the children to [their father] but that she refused to do so"; *State* v. *Lori T.*, supra, 197 Conn. App. 696; the Appellate Court improperly added a judicial gloss to § 53a-98 (a) (3), requiring that the state prove that the defendant had the ability to return the children but refused to do so. The defendant further argues that, even under this standard, the state failed to prove beyond a reasonable doubt that she had the ability to return the children and failed to do so.

The state contends that the Appellate Court correctly concluded that the evidence was sufficient to prove that the defendant refused to return her children to their lawful custodian, as required by § 53a-98 (a) (3). See id. The state contends that the defendant's "repeated refusal to send the children out to their father, evidenced both in word and deed, was specific action on her part that satisfied the 'otherwise refuses to return' element of [§ 53a-98 (a) (3)]." The state also contends that the Appellate Court did not apply a judicial gloss to the statute. Rather, it followed the rules of statutory construction and applied dictionary definitions to ascertain the meanings of the terms "refuse" and "return." The state also claims that "it is the defendant, not the Appellate Court, who adds to the statute, [by] claiming that it requires the state to prove that [the defendant] not only refused to return her children to their lawful custodian, but [also] that she had the actual ability to force them to go with their father." We agree with the state.

We begin with the standard of review. "In [a defendant's] challenge to the sufficiency of the evidence . . . [w]hether we review the findings of a trial court or the verdict of a jury, our underlying task is the same. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, [on] the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . . [W]e give great deference to the [verdict] of the [jury] because of its function to weigh and interpret the evidence before it and to pass [on] the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Adams*, 327 Conn. 297, 304–305, 173 A.3d 943 (2017).

"In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as

dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier [of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 158, 49 A.3d 962 (2012).

The evidence at trial, relevant to whether the state met its burden of proving the "otherwise refuses to return" element of § 53a-98 (a) (3), viewed in the light most favorable to sustaining the verdict, established that the father "went to pick . . . up [the children] on Memorial Day . . . according to [the] visitation schedule . . . and [the defendant] came out of her house and told [him] that *she wasn't sending the children out*. The children didn't want to come out, and *she was going to do what the children wanted to do*." (Emphasis added.) The defendant also told Nash that she did not make the children go outside to their father because they did not want to go with him. The defendant testified that she "wasn't making decisions for [her] children" and that she was "supporting whatever they needed." She also testified that the children "were convincing [her] of the reasons why they didn't want to go." The jury reasonably could have inferred that, far from using efforts commensurate with the situation to return the children in accordance with the trial court's custody and visitation order, the defendant refused to take any steps to return the children to their father upon his request and, instead, affirmatively abdicated her parental responsibility by allowing her children to decide whether to comply with the order.

The defendant contends, however, that she did not "refuse to return" the children because her testimony reflected that she did not prevent the children from going with their father,[8] and she essentially urged the children to go with their father. We disagree.

At trial, the defendant testified that, when the father arrived to pick the children up, "they refused to go. And, as a [mother], you have a certain amount of power to convince your children to do things. And, as I was like, you know, come on, they just kept giving me reasons why they didn't want to go. And it just [got] to the point where I felt that I had an obligation to let their voices be heard, to let them talk to some people.

I didn't refuse to let them go. They refused to go." To the extent that the defendant's telling the children "come on" could be construed as her urging the children to go, the jury was not required to accept the defendant's version of events. "[I]t is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Citations omitted.) *State* v. *Morgan*, 274 Conn. 790, 802, 877 A.2d 739 (2005). Moreover, the defendant's other testimony—namely, that she "wasn't making decisions for [her] children," that "[she] was supporting whatever they needed," and that the children "were convincing [her] of the reasons why they didn't want to go"—undermines her testimony that she essentially urged the children to go with their father.

We acknowledge that certain evidence demonstrated that the children had agreed that they were going to refuse to go with their father, that one of the children emailed the father, telling him she did not want to return to his home, and that the children refused to go with their father when he arrived to pick them up on Memorial Day. When the prosecutor asked L what prompted the children to make this decision, she responded that they had "been wanting to not go for a while, so, eventually, [they] just decided not to go with [their father]." We also recognize that Nash, members of the Glastonbury Police Department, and the Department of Children and Families could not persuade the children to go with their father. The father also did not persuade the children to return home with him. Nevertheless, this evidence focuses on the actions of the children, their father and law enforcement, not the defendant. As we explained, had the defendant taken any steps to return the children to their father, but the children nonetheless refused, then we would have to address the more difficult question of what additional steps, if any, the defendant would have been required to take. We need not, however, resolve that question in the present case because the evidence, viewed in the light most favorable to sustaining the verdict, demonstrated that the defendant refused to do anything but follow the will of her children. We agree with the Appellate Court that the evidence was sufficient to support the defendant's conviction of three counts of custodial interference in the second degree. See *State* v. *Lori T.*, supra, 197 Conn. App. 696.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective

order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

Moreover, in accordance with our policy of protecting the privacy interests of victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] After the defendant and the children's father divorced, the two initially shared custody of their four children. The defendant had residential custody, and the father would visit with his children on Wednesday evenings and every other weekend, with holidays divided between the two parents. Thereafter, the defendant's teenage son from a prior marriage was charged with sexual assault, and the four younger children went to live with the father.

[2] The defendant contends that *State* v. *Corbeil*, supra, 41 Conn. App. 7, and another case we cite to in this opinion, *Rana* v. *Terdjanian*, 136 Conn. App. 99, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d 886 (2012), are inapposite because "there was no barrier to the defendant's ability to unilaterally achieve the result required by the statute" in each of those cases and, accordingly, "it was clear how a defendant could avoid criminal liability." In this case, the defendant contends, the statute is silent about what action is required to "return" the children, who have willpower of their own.

We are not persuaded for two reasons. First, these decisions shed light on the meaning of the terms "refusal" and "refused," not "return." See *Rana* v. *Terdjanian*, supra, 136 Conn. App. 121; *State* v. *Corbeil*, supra, 41 Conn. App. 18–19. Second, whether a person is ultimately successful in accomplishing the return of the child is not necessarily dispositive of the "otherwise refuses to return" inquiry. For the purposes of this opinion, we need not decide whether an individual who takes affirmative steps to send a child back to his or her lawful custodian is nevertheless criminally liable if the child does not ultimately return. As we will discuss in this opinion, the defendant in this case took no steps—such as telling the children that they had to go with their father or packing their belongings and bringing them outside—to return the children to their father.

[3] Our statutory scheme allows for parents to have physical control over their children. For example, there is a parental justification defense to the use of force. General Statutes § 53a-16 provides in relevant part that, "[i]n any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a defense. . . ."

General Statutes § 53a-18, in turn, provides in relevant part: "(a) The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances:

"(1) A parent, guardian or other person entrusted with the care and supervision of a minor or an incompetent person, except a person entrusted with the care and supervision of a minor for school purposes as described in subdivision (6) of this section, may use reasonable physical force upon such minor or incompetent person when and to the extent that he or she reasonably believes such to be necessary to maintain discipline or to promote the welfare of such minor or incompetent person. . . ." See also, e.g., *State* v. *Mark T.*, 339 Conn. 225, 242, 260 A.3d 402 (2021) ("[the parental justification] defense provides that such force is not criminal, as long as it is reasonable" (internal quotation marks omitted)).

[4] The defendant seemed to acknowledge that she had an obligation to take some action to return the children to their father when she testified regarding the limits of what she could do to effectuate that return. Specifically, she testified that the children planned not to go and "[t]hey weren't [small children] that [she] could pick up and buckle into their car seat and make them go."

[5] At least one court has held, in a related context, that a parent who takes affirmative steps to facilitate visitation has satisfied her obligation, even if a child refuses to comply. See, e.g., *Hancock* v. *Hancock*, 122 N.C. App. 518, 525, 471 S.E.2d 415 (1996) ("Nowhere in the record do we find evidence that [the] plaintiff acted purposefully and deliberately or with knowledge and stubborn resistance to prevent [the] defendant's visitation with the child. *The evidence shows* [*that the*] *plaintiff prepared the child to go, encouraged him to visit with his father, and told him he had to go. The child simply refused.* [*The*] [*p*]*laintiff did everything possible short of using physical force or a threat of punishment to make the child go with his father.* [Although] perhaps the plaintiff could have used some method to physically force the child to visit his father, even if she improperly did not

force the visitation, her actions do not rise to a [wilful] contempt of the consent judgment." (Emphasis added.)).

[6] The defendant claims that relying on her statements is impermissible because it punishes her for her speech or inaction, which is antithetical to first amendment jurisprudence. We are not persuaded.

The defendant was punished for her conduct in refusing to return her children to their father, not for the content of her speech alone. See, e.g., *State v. Taupier*, 330 Conn. 149, 178 n.19, 193 A.3d 1 (2018) ("statute criminalizing threats directed at public servants was constitutional because 'the statute punishes conduct rather than the content of speech alone and bears a rational relationship to the [s]tate's legitimate and compelling interest in protecting public servants from harm' " (quoting *Ex parte Eribarne*, 525 S.W.3d 784, 785 (Tex. App. 2017, pet. ref'd))), cert. denied,    U.S.   , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019). The defendant's speech merely evidenced her mens rea.

[7] The defendant similarly claims that the clear core exception does not apply to her case because Barao doubted the application of § 53a-98 (a) (3) when he declined to arrest the defendant. Although it is true that Barao declined to arrest the defendant, there is nothing in the record to suggest that this was the result of uncertainty as to the statute's application. Rather, the record reflects that, as a matter of discretion, the Glastonbury Police Department often refers such cases to family court.

[8] We note that not *preventing* the children from leaving with their father says nothing about whether the defendant refused to *return* the children. Whether an individual prevents a child from leaving with his or her lawful custodian is more appropriately encompassed by the "holds" and "keeps" aspects of § 53a-98 (a) (3). As we explained, the "refuses to return" aspect includes, at its core, an individual who declines to take any action to send a child back to his or her lawful custodian.

––––––––––––––––––––